USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/11/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GUILLAUME JACQUETY, :
:
Petitioner, :
:
- against - :
:
GERALDINE HELENA TENA BAPTISTA, :
and DR. YOUSSEFF ZAIM WADGHIRI, :
:
Respondents. :
-------------------------------------------------------------X

19-CV-9642 (RWL)

**DECISION AND ORDER
AFTER TRIAL**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Petitioner, Guillaume Jacquety ("Guillaume" or "Petitioner"), and Respondent Geraldine Helena Tena Baptista ("Geraldine") were, until recently, husband and wife under French law.[1] They have a young daughter, referred to herein as "E.J." In early November 2018, Geraldine traveled with E.J. from the family's home in Morocco to Geraldine's mother's home in Switzerland and then a few days later to Portugal, where they were joined by Respondent Dr. Yousseff Zaim Wadghiri ("Wadghiri"). From there, Geraldine, E.J., and Wadghiri traveled to New York City, where they have since lived in Wadghiri's home.

On October 18, 2019, Guillaume filed a petition seeking return of E.J. to Guillaume's custody in Morocco (the "Petition"), pursuant to the Hague Convention on Civil Aspects of International Child Abduction (the "Convention") and the Convention's implementing statute, the International Child Abduction Remedies Act, 22 U.S.C. § 9001, et seq. ("ICARA"). Respondents oppose the Petition on the grounds that E.J. will face a

---

[1] The Court uses Guillaume and Geraldine's first names for clarity.

grave risk of harm if she were to return to Morocco. The Court conducted trial over twelve days, and received post-trial briefing.[2] The Court has given the matter careful and thorough consideration, and for the reasons set forth below, DENIES the Petition.

## Legal Framework

In order to contextualize the extensive facts of this matter it is helpful to first consider the governing legal principles.

### A. The Convention's General Principles And Requirements

Both the United States and Morocco are signatories of the Convention. The Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Convention, Preamble; 51 Fed. Reg. 10494, 10498 (March 26, 1986). "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (internal quotation marks and brackets omitted); *accord Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (stating that Convention was adopted "in response to the problem of international child abductions during domestic disputes").

Accordingly, "[t]he Convention's remedy of repatriation is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing

---

[2] The parties consented to my jurisdiction for all purposes on October 9, 2020. (Dkts. 78-80.)

international boundaries in search of a more sympathetic court." *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) (internal quotation marks omitted). "The Convention does not establish substantive standards for resolving the merits of any underlying custody dispute. Rather, the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota*, 692 F.3d at 112; *see* 22 U.S.C. § 9001(b)(4) (providing that a court may only determine rights under the Convention, not the merits of custody disputes). In other words, "the focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather it is the specific claims and defenses under the Convention." *In re Lozano*, 809 F. Supp.2d 197, 217 (S.D.N.Y. 2011) (internal quotation marks omitted), *aff'd sub nom. Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

To prevail on a claim under the Convention, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005); *see also* 22 U.S.C. § 9003(e)(1) (setting forth petitioner's burden). "[O]nce a [petitioner] establishes that removal was wrongful, the child ***must be returned*** unless the respondent can establish one of four defenses." *Blondin v. Dubois*, 189 F.3d 240, 244-45 (2d Cir. 1999) ("*Blondin II*") (emphasis in original).

**B.    The Grave Risk Exception**

One of those defenses, and the only one invoked by Respondents, is the grave-risk exception.  "While the Convention is designed, in part, to ensure the prompt return of children wrongfully removed or retained from their country of habitual residence by one parent, it also protects children who, though so removed or retained, face a real and grave risk of harm upon return."  *Ermini v. Vittori*, 758 F.3d 153, 156 (2d Cir. 2014).  The grave-risk exception is found in Article 13 of the Hague Convention, which states that:

> the judicial … authority of the requested State is not bound to order the return of the child if the person … which opposes its return establishes that … there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Convention, art. 13(b).

The Second Circuit has explained the high bar required to meet the exception:

> [A] grave risk of harm from repatriation arises … in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.  The potential harm to the child must be severe, and the … level of risk and danger required to trigger this exception has consistently been held to be very high.  The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize.

*Souratgar*, 720 F.3d at 103 (internal quotation marks, citations, and emphasis omitted); *see also Norden-Powers v. Beveridge*, 125 F. Supp.2d 634, 640 (E.D.N.Y. 2000) (collecting cases).  The exception is to be interpreted narrowly, "lest it swallow the rule." *Souratgar*, 720 F.3d at 103 (internal quotation marks omitted); *see also* 22 U.S.C. § 9001(a)(4) (referring to the Convention's "narrow exceptions").

The grave-risk inquiry is "not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 104. "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id.* (collecting cases). In contrast, "[t]he exception to repatriation has been found where the petitioner showed a sustained pattern of physical abuse and / or a propensity for violent abuse that presented an intolerably grave risk to the child." *Id.* (internal quotation marks omitted). As the Second Circuit has explained:

> [A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) ("*Blondin IV*")

"Evidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse," though "[e]vidence of this kind … is not dispositive in these fact-intensive cases." *Souratgar*, 720 F.3d at 104 (internal quotation marks, brackets, and citations omitted); *see also Davies v. Davies*, 717 F. App'x 43, 49 (2d Cir. 2017) (summary order) (finding no error in district court's grave risk finding "premised on overwhelming evidence of Mr. Davies's extreme violence and uncontrollable anger, as well as his psychological abuse of Ms. Davies over many years, much of which was witnessed by [the child]") (internal quotation marks and emphasis omitted); *Ermini*, 758 F.3d at 164 ("Spousal violence …

5

can also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child"); *Mohácsi v. Rippa*, 346 F. Supp.3d 295, 320, 322 (E.D.N.Y. 2018) ("witnessing the abuse of [one's] mother is enough to establish the applicability of the defense"), *aff'd sub. nom. In re NIR*, 797 F. App'x 23 (2d Cir. 2019) (summary order affirming denial of petition).

Even if the requirements of the grave risk of harm exception are met, principles of comity require the court to "determine whether there exist alternative ameliorative measures that are either enforceable by the District Court or, if not directly enforceable, are supported by other sufficient guarantees of performance." *Saada v. Golan*, 930 F.3d 533, 541-42 (2d Cir. 2019). The Court may consider, among other things, "whether [the other country's] courts will enforce key conditions" to protect the child. *Id*. at 541.

The Convention's grave-risk exception is an affirmative defense that the respondent must prove "by clear and convincing evidence," although "subsidiary facts need only be proven by a preponderance of the evidence." *Elyashiv v. Elyashiv*, 353 F. Supp.2d 394, 404 & n.10 (E.D.N.Y. 2005) (internal quotation marks and ellipsis omitted); *see* 22 U.S.C. § 9003(e)(2)(A).

### The Trial

The trial of this matter took place by remote means over twelve days between January 25, 2021 and February 9, 2021.[3] The parties stipulated to Petitioner's prima

---

[3] The Court uses the following conventions for citing trial-related materials: "Tr." refers to the trial transcript (Dkts. 181-205); "P-" refers to Petitioner's exhibits; "R-" refers to Respondent Baptista's exhibits; "W-" refers to Respondent Wadghiri's exhibits; "Stip." refers to the parties' stipulated facts (Dkt. 132-1); "Pet. Mem." refers to Petitioner's Post-Trial Brief (Dkt. 156); "Resp. Mem." refers to Respondent Baptista's Post-Trial Brief (Dkt. 154); "Wadghiri Mem." refers to Respondent Wadghiri's Post-Trial Brief (Dkt. 151); "Pet.

facie case.  (Dkt. 132-1; Tr. 17.)  Accordingly, the issues for trial were whether E.J. faced a grave risk of physical or psychological harm if she were repatriated to Morocco and, if so, whether arrangements could be implemented in Morocco that would adequately protect E.J. from that grave risk of harm.  Bearing the burden of proof on proving grave risk, Respondents put on their case first, followed by Petitioner.

## A.    The Fact Witnesses And Their Credibility

The majority of trial focused on the relationship between Guillaume and Geraldine, and the extent to which either physically or psychologically abused the other as well as the extent to which any such abuse or violence occurred where E.J. could see or hear it. Geraldine and Guillaume's testimony directly conflicted with each other on most all salient facts and events.  Geraldine testified that on many occasions Guillaume abused her both physically and psychologically.  Guillaume testified that he never committed any violence toward Geraldine and that the only violence exhibited was by Geraldine to Guillaume. Neither party introduced corroborating evidence of harm from physical violence, such as pictures, medical records, or police reports.  Determination of the facts regarding Geraldine and Guillaume's treatment of each other as well as their testimony on other issues rests to a large degree on a credibility determination as to whom to believe.

Reply" refers to Petitioner's Post-Trial Reply Brief (Dkt. 166); "Resp. Reply" refers to Respondent Baptista's Post-Trial Reply Brief (Dkt. 163); and "Wadghiri Reply" refers to Respondent Wadghiri's Post-Trial Reply Brief (Dkt. 165).  Along with post-trial briefs, the Court asked the parties to each submit a chronology of key events.  "P-Chron" refers to Petitioner's chronology, attached as Exhibit A to his Post-Trial Brief; "R-Chron" refers to Respondent Baptista's timeline submitted as a separate document (Dkt. 155).

### 1.    Geraldine

Geraldine testified over the course of four days; Guillaume over three days.  Based on observation of their demeanor while testifying, the internal consistency or inconsistency of their testimony, the consistency or inconsistency of their testimony with other evidence, the testimony of others, and the presence or absence of corroborating evidence, the Court found Geraldine more credible than Guillaume.  That is not to say that the Court accepted as true everything that Geraldine said or rejected as untrue everything that Guillaume said – as is often the case, the truth likely lies somewhere in between on some of the subjects to which they testified.  But, in determining if and to what extent abuse took place, and whether it occurred in the presence of E.J., the Court found Geraldine more credible more of the time.

Geraldine is passionate and demonstratively emotive; to some extent, the Court found her prone to exaggeration and imprecise or overly-generalized description.  She admittedly lied on various travel, governmental, and asylum-related documents about exactly when she first decided to leave Morocco with E.J. for good.[4]  (Tr. 433-35, 446, 460-62, 469.)  Yet her testimony was unwavering and internally consistent, as was what she had described historically to others, including in texts with Guillaume, communications to family, treatment with a mental health care provider during her time in

---

[4] The repeated lie was that Geraldine had decided to leave Morocco for good only after she had already left the country and was staying with her mother in Switzerland, rather than when she was still in Morocco.  Geraldine explained that she lied about that particular fact because she was afraid "to confess" that she had been planning to escape for a long time.  (Tr. 736.)  She apparently thought there was legal significance as to when and where she made the decision.  (*See* Tr. 736.)  Without excusing the lie at all, it would not be illogical for an abuse victim to lie on government documents to protect herself.  That said, Geraldine obviously had a motive to lie, and has shown that she will lie.  But her testimony overall proved to be more credible than Guillaume's as explained above.

New York, and her recounting of events to a psychologist, Dr. B.J. Cling, retained by Respondents to evaluate Geraldine. Significantly, corroboration also can be found in the E.J.'s own words as told to psychologist Dr. Megan Goslin, retained by Respondents to evaluate E.J.

### 2. Guillaume

In comparison to Geraldine, the Court found Guillaume to be less than credible in making many of his denials. For instance, he did not credibly testify about the one video in evidence depicting him acting in a potentially violent way in front of E.J. (R-283.) In the video, taken by Geraldine with a phone during a family vacation, Guillaume puts on a skirt and top that was purchased for E.J. Guillaume makes playful comments with E.J., as does Geraldine. Guillaume then twice tells Geraldine to stop filming. When Geraldine does not, Guillaume can be seen making a quick movement toward the camera and swinging his arm, followed by a sound of contact with and dislodging of the phone, at which point the video stops. When asked on direct examination to describe his conduct, Guillaume fumbled over his words, characterizing his having moved "violently," then backpedaling to "quickly," and then "riskily." (Tr. 1957.) He testified that his intent was to grab the phone from Geraldine but only "succeed to slap the phone" because Geraldine moved her hand back. (Tr. 1957-58.) His slapping the phone was "not voluntary" (Tr. 2013), and the phone merely "f[e]ll down on the floor," suggesting a more trivial and gentle event than that recorded. (Tr. 1957-58.) At the very least, the video depicts an explosive, violent act, whether or not directed to the phone held by Geraldine or Geraldine herself, made while in the presence of E.J.

As another example, Guillaume testified that just the day before his testimony, he contacted services in Morocco to identify child therapists experienced in post-traumatic stress disorder ("PTSD") to help E.J. if she returns there.  (Tr. 1954.)  Guillaume said that he did not know that E.J. had been diagnosed with PTSD until Respondents' expert child psychologist, Dr. Goslin, testified.  (Tr. 1956.)  But Dr. Goslin's report, including her diagnosis of E.J., was disclosed to Petitioner at least a month or two earlier.  (Tr. 1956; *See* R. 449-1 at 15 (Goslin Report dated Oct. 18, 2020).)   Guillaume then gave contradictory testimony about the extent to which he read the report; he acknowledged having received it and starting to read it but then "very, very quickly" decided to stop, leaving it to his lawyers.  (Tr. 1956.)  That testimony not only was not credible (at the very least, his lawyers could be expected to have informed him about its contents), it betrayed an effort made too little too late.  Regardless of whether E.J. had been diagnosed with PTSD, Guillaume was well aware of E.J.'s mental health issues, acknowledging both his belief that E.J. had been traumatized at least by her having been uprooted to New York (Tr. 2257-58), and E.J.'s avoidance of Guillaume during FaceTime calls in the fall of 2020 (discussed below).

A third such example concerns a two-month period during 2019 when Guillaume refused to take FaceTime calls from Geraldine so that E.J. could speak with her father. Between the time that Geraldine had left Morocco for good with E.J. in November 2018 and mid-February 2019, Geraldine called Guillaume periodically so that he could speak with E.J. for a short time.  (Tr. 1876.)  But after February 15, 2019, until April 23, 2019, which was E.J.'s birthday, Guillaume did not answer calls to speak with E.J.  (Tr. 1877-78, 2154.)  The reason Guillaume first gave for doing so was that on February 15, 2019,

he had a call with E.J. and Geraldine in which lawyers were mentioned.  (Tr. 1877, 1894.)

Guillaume testified that he was concerned that the subject of lawyers had been mentioned

in E.J.'s presence, and by not taking the calls Guillaume could change Geraldine's

behavior during the calls.  (Tr. 1877, 2156.)

But when confronted with the question of how he thought not speaking with E.J.

for two months would be helpful to E.J., Guillaume at first did not answer the question,

instead mentioning two new reasons for not taking the calls – first, the hours when

Geraldine called often were erratic, and second, he had had a sky-diving accident from

which he had been convalescing.  (Tr. 2157-58.)  In other words, Guillaume deflected the

question and then gave shifting reasons as to why he stopped taking the calls.  And, even

those reasons differed from what he had told his expert in this case, namely that he had

not spoken with E.J. during that time on advice of his lawyers.  (Tr. 2162-63; R-245 at

284.)  Then, when Guillaume ultimately did answer the question about why he thought

ignoring the calls would help E.J., all he could muster was "I don't know.  It was just a

test."  (Tr. 2160.)  Guillaume never told E.J. that he would not be speaking with her for

some time (Tr. 2157), and he ultimately spoke to E.J. on April 23, 2019, only after

Geraldine pleaded with him to speak with E.J. on her birthday.[5]  (R-19T at 6807 ("I beg

you to speak to her on the day of her birthday").)  Though admitting that Geraldine

begged, Guillaume denied that that was the reason he finally spoke with E.J.  (Tr. 2163-

64.)

---

[5] The record in this case contains extensive exchanges of electronic messages between
Geraldine, Guillaume, and others.  The parties used varied means of communicating,
such as standard phone text, WhatsApp texts and phone calls, and FaceBook.  The Court
uses the term "text" and "message" generically to refer to all of these, regardless of the
particular application used, unless there is a particular reason to specify.

The foregoing examples are but three of many such instances where the Court found Guillaume's testimony less than credible. And, as noted, Geraldine had her own such moments, but none as telling as Guillaume's nor as many as Guillaume's.

### 3. The Housekeeper

The only testifying witness who was present at or about the time of an alleged instance of physical violence was Guillaume and Geraldine's housekeeper, Elisa Manga, who was hired in August 2016. She now works solely for Guillaume, and is dependent on him for her salary, half of which she sends to her family back in Senegal. Guillaume called Manga on his case to testify generally about what she did not see or hear, and also about a particular incident about which Geraldine testified. After both direct and cross-examination, the Court found Manga's testimony generally unreliable and of little assistance. Manga refuted a key aspect of Geraldine's testimony about an attack by Guillaume (namely, that Manga intervened to save Geraldine), but she could not recall much of what transpired during the specific incident in question; she testified to seeing Geraldine crying while sitting on a staircase, but could not testify to what happened leading up to that; and she evinced a lack of understanding of many of the questions posed to her.[6] Although Manga lived with the family from Monday to Saturday noon and testified that she was not aware of any instances of physical violence, her room adjoined one side of the kitchen and thus was separated from the rest of the house. As a result,

---

[6] Ms. Manga is from Senegal and did not proceed with formal education beyond third grade. (Tr. 1595-97.) She did not recognize or recall a written statement in her name and with her signature that Guillaume had submitted in support of a criminal complaint he filed against Geraldine in Switzerland. (Tr. 1617.) Nor does she know who even wrote it, while Guillaume testified that he wrote it and read it to Manga. (Tr. 1624, 2276.)

Manga agreed that whenever she was in her own room, she would not have seen or heard what happened in much of the house.

### 4.    E.J.

Apart from Geraldine and Guillaume's relationship, the other major focus of the case was, as it should be, on E.J.  Although E.J., who was six years old at the time of trial, did not testify, her words, actions, and observations were present during trial through a variety of sources: videos of FaceTime visits between her and Guillaume; a video of the family on vacation; pictures and videos of E.J. and Guillaume together; text messages and testimony of Geraldine and Guillaume mentioning E.J.; and interviews and evaluation of E.J. by Dr. Goslin.

### 5.    Wadghiri

The only other fact witness who testified was Respondent Wadghiri.  He testified about his relationship with Geraldine, the extent to which he was or was not involved in any planning of Geraldine and E.J.'s removal to the United States, and the extent to which he has or has not provided support to Geraldine and E.J. since then.  The Court found Wadghiri entirely credible.  He testified calmly, directly, consistently, knowledgeably and thoughtfully.  He was neither evasive nor defensive.

## B.    The Mental Health Experts

Three mental health experts testified at trial, two for Respondents, one for Petitioner.  The Court accepted all three as experts in their fields.  Respondents' two experts were Dr. Cling and Dr. Goslin.  Dr. Cling interviewed and evaluated Geraldine and testified that Geraldine suffers from post-traumatic stress disorder ("PTSD") due to domestic violence.  Dr. Goslin, interviewed and evaluated E.J. and testified that E.J. also

suffers from PTSD, and that, if E.J. returned to Morocco, her condition would deteriorate and interfere with her development and she would be at grave risk of harm. As explained further below, the Court found both Dr. Goslin and Dr. Cling to be credible, and Dr. Goslin especially so.

Petitioner's expert, Dr. Peter Favaro, did not interview or evaluate Geraldine or E.J. Instead, he opined about the reliability of Dr. Goslin's and Dr. Cling's opinions. The Court found Dr. Favaro to be largely credible as well but of limited assistance. In short, Dr. Favaro testified that Drs. Cling and Goslin did not sufficiently qualify their opinions or rule out other hypotheses as to whether or why Geraldine and E.J. suffered from PTSD. Dr. Favaro conceded, however, that he has no opinion about whether the opinions of Dr. Cling and Dr. Goslin are correct. He also acknowledged that he had no opinion about whether E.J. would face grave risk of harm if returned to Morocco.

Prior to trial, Petitioner moved to exclude the opinions of Dr. Cling and Dr. Goslin as unreliable based on Dr. Favaro's criticisms as set forth in his expert report. The Court denied that motion, having determined that the criticisms go to weight and not admissibility. *See In re Term Commodities Cotton Futures Litigation*, 12-CV-5126, 2020 WL 5849142, at *24 (S.D.N.Y. Sept. 30, 2020) ("The weight and credibility of the experts can and should be explored on cross-examination") (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)); *Packard v. City of New York*, 2020 WL 1479016, at *5 (S.D.N.Y. March 25, 2020) (disputes concerning expert's methodology went to weight, not admissibility) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

**C.     The Moroccan Law Experts**

Each side retained an expert to opine about protections for victims of domestic violence in Morocco.  The parties agreed to have the Court accept those experts' reports as their testimony and to forego cross-examination.  The Court has proceeded in that manner.

**D.     Evidentiary Issues**

Several evidentiary issues warrant discussion.

**1.     Language Difficulties (Testimony And Texts)**

Language was a partial barrier at trial.  Both Geraldine and Guillaume's native language is French.  They testified in English with the assistance of a French translator when needed.  A French interpreter was used for all purposes for the testimony of the housekeeper, Ms. Manga.  That said, French was not her native language, which is a particular African dialect.  As noted earlier, the Court questions to some extent whether Manga fully understood every question, whether or not that had to do with language.  In any event, the Court has adhered to the testimony of all witnesses as transcribed.

Interpretation also came into play with respect to the extensive array of texts and other communications to or from Geraldine and Guillaume, all of which were in French.  The parties provided certified translations, but from time to time the parties questioned a particular translation.  In a few instances, the parties and counsel agreed to a corrected translation on the record.  In some instances, the parties disagreed about the correct translation without resolution.  Again, the Court is guided by the certified translations unless corrected by agreement or subsequent interpretation by the certified interpreter who translated trial testimony as needed.

Moreover, even where there was no disagreement, the English translations did not always faithfully convey nuances of the parties' communications endemic to their native language. And, in some instances, the English translation, even if faithful, did not necessarily yield a message devoid of ambiguity. Both Guillaume and Geraldine, however, testified to what they meant in messages they sent and what they understood to have been meant in messages they received.

## 2. Hearsay Generally

Hearsay issues came up quite a bit during trial and were often resolved by rulings that allowed the evidence for limited purposes, such as evidence of motivation or understanding, and not for the truth of the matter asserted. The hearsay issue was particularly salient, as one can imagine in a case involving claims of domestic violence, with respect to whether statements could be considered as proof that either Guillaume or Geraldine committed acts of violence or abuse. In parsing the evidence, the Court has carefully adhered to the limited purpose for which messages or other evidence of that type may be considered.

## 3. Statements To Mental Health Care Professionals

One hearsay issue was reserved for consideration and is resolved here. Specifically, the parties disagree as to whether the Court may accept statements made by E.J. to Dr. Goslin for the truth of what they say.[7] For example, when interviewed by Dr. Goslin, E.J. told her that her father "smacked" her mother (Tr. 833) and "I didn't trust my dad at all" (Tr. 834). A similar issue also initially was raised with respect to Geraldine's statements to Drs. Cling and Goslin and to Darwin Rodriquez, a social worker who

---

[7] The parties submitted letter briefs on this issue. (Dkts. 138, 139.)

Geraldine saw for mental health issues when she came to New York. That issue is resolved as follows: the statements, to the extent they reflect what Geraldine said and do not include hearsay within hearsay, are admitted for their truth; hearsay within hearsay, such as Geraldine's statements as to what someone else said, are not admitted for their truth. (*See* Tr. 1149, 1152 (Petitioner counsel not objecting to Rodriquez records insofar as they reflect things that Geraldine said to Rodriquez), 1458 (Petitioner's counsel preserving objections to "double hearsay-type statements").) Geraldine, of course, testified and was subject to extensive cross-examination on whether her statements were truthful or not.

As E.J. did not testify at trial, however, her statements to Dr. Goslin remain hearsay. Whether they can be admitted for their truth turns on application of the diagnosis or treatment exception to admissibility of hearsay. Under the Federal Rules of Evidence,[8] E.J.'s statements to Dr. Goslin are admissible if they (A) were "made for – and [are] reasonably pertinent to – medical diagnosis or treatment; and (B) describe[ ] medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). Statements are admissible under Rule 803(4) on the basis that the declarant is expected to tell the truth when she "understand[s] that she is providing

---

[8] Courts have held or suggested that the Federal Rules of Evidence generally apply in ICARA cases. *See, e.g.*, *Luedtke v. Luedtke-Thomsen,* No. 1:12-CV-750, 2012 WL 2562405, at *1 (S.D. Ind. June 29, 2012) (holding that the Federal Rules of Evidence apply to Hague Convention hearings); *Avendano v. Smith*, No. Civ. 11-0556, 2011 WL 3503330, at *1 (D.N.M. Aug. 1, 2011) (same); *accord Karkkainen v. Kovalchuk*, 445 F.3d 280, 285 (3d Cir. 2006) (finding no abuse of discretion where district court admitted hearsay testimony "only under the exceptions of the Federal Rules and properly limited its use"). Authentication, however, is expressly not required under the statute. 42 U.S.C. § 11605. The parties tried the case pursuant to the Federal Rules, invoking them with respect to admission or exclusion of evidence.

information for purposes of diagnosis or treatment."  *United States v. Kootswatewa*, 893 F.3d 1127, 1133 (9th Cir. 2018).  "An adequate foundation may be laid under Rule 803(4) by introducing objective evidence of the context in which the statements were made" and "can include testimony provided by the medical professional who conducted the examination."  *Id*.

Dr. Goslin established the requisite foundation at trial.  She testified that she explained to E.J. that she was a "talking and feelings doctor" and that she would "be asking [E.J.] questions and talking with [her] to understand how [she was] doing."  (Tr. 796, 846.)  E.J. referred to Dr. Goslin as "Dr. G." throughout the interviews, thus indicating that E.J. understood Dr. Goslin was in fact a doctor.  (Tr. 847.)  Dr. Goslin further explained that E.J. "had the appropriate fluency" to participate in clinical interviews in English.  (Tr. 796, 804.)  Moreover, even though only six years old, E.J. had been visiting child psychiatrists and speech therapists for several years while in Morocco and thus was familiar with speaking to them for treatment and diagnosis.  (*See* Tr. 748.)  There also is no contrary evidence suggesting that E.J. did not understand that her statements to Dr. Goslin were for purposes of diagnosis.  *See Kootswatewa*, 893 F.3d at 1133 (affirming that Rule 803(4) exception applied where there was "evidence supporting the inference the [child] understood that the nurse practitioner was seeking information for purposes of diagnosis").

In opposition, Petitioner cites three Eighth Circuit cases that are entirely distinguishable, precisely because the appropriate foundation had not been laid in any of them.  *See United States v. Sumner*, 204 F.3d 1182, 1184-86 (8th Cir. 2000) (reversing conviction because doctor failed to discuss with six-year-old victim why it was important

to be truthful or the role of the medical professional in helping her); *United States v. Beaulieu*, 194 F.3d 918, 920-21 (8th Cir. 1999) (reversing conviction where child's testimony showed she understood the purpose of her visit to the nurse and psychologist was "just to get evidence" (internal brackets omitted)); *Olesen v. Class*, 164 F.3d 1096, 1097-98 (8th Cir. 1999) (reversing conviction where state failed to prove that five-year-old child had motive in making statement consistent with promoting treatment and understood medical significance of being truthful in identifying her abuser).

Petitioner also argues that E.J.'s statements to Dr. Goslin should not be admitted for their truth pursuant to Rule 803(4) because Dr. Goslin was retained by a party to provide a forensic opinion in litigation.  The law draws no such distinction.  *See O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1089 (2d Cir. 1978) ("Rule 803(4) clearly permits the admission into evidence of what [a patient] told [a doctor retained for the purposes of the litigation] about her condition, so long as it was relied on by [the doctor] in formulating his opinion" and the foundation is properly laid); Fed. R. Evid. 803(4) advisory committee notes to the 1972 proposed rules (Rule 803(4) "rejects" the former rule that statements made to a forensic physician were inadmissible hearsay).

Finally, Petitioner contends that E.J.'s statements are inadmissible "since diagnosis and etiology (a condition's cause), are entirely different matters."  (Dkt. 138 at 2.)  That argument is flatly contradicted by the express language of the rule, which permits admission when the statement "describes medical history; past or present symptoms or sensations; their inception; or their general cause."  Fed. R. Evid. 803(4).  E.J.'s statements about her father's conduct toward her mother go directly to the symptoms and

cause of her PTSD as diagnosed by Dr. Goslin.  Accordingly, E.J.'s statements to Dr. Goslin are admissible for the truth of the matter asserted.

### 4. Alleged Spoliation

During trial, Petitioner elicited testimony from Geraldine and Wadghiri in an effort to establish that they had spoliated evidence.  In his post-trial brief, Petitioner addressed one event in regard to spoliation: when, in June 2019, Wadghiri, with Geraldine's permission, reset Geraldine's Moroccan phone to factory settings thereby deleting WhatsApp and text messages.[9]  (Pet. Mem. at 10-11.)  Petitioner has not demonstrated that spoliation occurred.

While living in Morocco between September and November 2018, Geraldine communicated with Wadghiri using her Moroccan phone furnished by Guillaume's company.  (Tr. 1225-26, 1916-17.)  When Geraldine arrived in New York in November 2018, Wadghiri gave her a phone with a U.S. number and began communicating with her using that number.  (Tr. 1226-27.)  At some point thereafter, the service for her Moroccan phone was terminated, by Guillaume or his company, rendering it useless in the U.S.[10]

---

[9] At trial, Petitioner elicited testimony and introduced evidence concerning two other deletion events.  The first occurred in October 2018, when Geraldine deleted Facebook Messenger messages about her and Wadghiri's relationship that Wadghiri thought would be "vulnerable" to access by Guillaume.  (See Tr. 511-17; P-50 at 735.)  Geraldine went even further, deleting a broader range of Facebook Messenger messages and admittedly seeking to conceal information relating to her planned escape with E.J. out of Morocco.  (Tr. 523-24.).  The second deletion event occurred in November 2018, when, to avoid confusion and misdirected messages, Wadghiri deleted from his phone the phone number for Geraldine's defunct Moroccan phone, resulting in deletion of his WhatsApp messages with the Moroccan phone.  (Tr. 1227-29.)  Petitioner has not included either of these events in his post-trial spoliation briefing, presumably because they pre-dated any events that would arguably trigger the duty of preservation.

[10] Guillaume testified that Geraldine's Moroccan phone service was cancelled by the "operator" because its contract was out of date. (Tr. 1916-17.)

(Tr. 1232, 1916-17.)   Because the Moroccan phone could not be used in the U.S., Geraldine and Wadghiri decided to give the phone to Wadghiri's sister the next time he visited Morocco in June 2019.  (Tr. 527, 1232-33.)  Before giving the phone to his sister, Wadghiri reset the phone to its original factory settings, as one reasonably would do in giving a used phone to someone else, which resulted in deletion of Geraldine's WhatsApp and text messages.   (Tr. 527, 1233-34; P-76; P-77.)   No evidence or testimony contradicted Geraldine and Wadghiri's testimony about why Wadghiri reset the Moroccan phone.

The Second Circuit defines spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  Where a movant seeks sanctions based on the destruction or loss of evidence, it must demonstrate "'that the sought-after evidence actually existed'" before spoliation.  *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp.3d 394, 408 (S.D.N.Y. 2015) (quoting *Farella v. City of New York*, No. 05-CV-5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)).

The burden is on the moving party to prove the elements of a spoliation claim by a preponderance of the evidence.  *McIntosh v. United States*, No. 14-CV-7889, 2016 WL 1274585, at *33 (S.D.N.Y. March 31, 2016) (quoting *Dilworth v. Goldberg*, 3 F. Supp.3d 198, 200 (S.D.N.Y. 2014)).  The requisite elements are "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact

could find that it would support that claim or defense." *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Determining whether or not a party had an obligation to preserve evidence involves "two related inquiries: ***when*** does the duty to preserve attach, and ***what*** evidence must be preserved?" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (emphases in original); *see, e.g.*, *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp.2d 409, 430-31 (S.D.N.Y. 2009) (assessing when the obligation began separately from the scope of the obligation). In many cases, the duty to preserve begins when the plaintiff files suit, but it "varies with the circumstances of the case." *Quraishi v. Port Authority of New York and New Jersey*, No. 13-CV-2706, 2015 WL 3815011, at *5 (S.D.N.Y. June 18, 2015).

The duty to preserve can arise "[e]ven before formal initiation of an action, 'once a party reasonably anticipates litigation.'" *Experience Hendrix, L.L.C. v. Pitsicalis*, No. 17-CV-1927, 2018 WL 6191039, at *7 (S.D.N.Y. Nov. 28, 2018) (internal brackets omitted) (quoting *Zubulake*, 229 F.R.D. at 431); *see, e.g.*, *Karsch v. Blink Health Ltd.*, No. 17-CV-3880, 2019 WL 2708125, at *18 (S.D.N.Y. June 20, 2019) (plaintiff's letter to defendants threatening legal action triggered the duty to preserve). A party that reasonably anticipates litigation must maintain all evidence that they knew or "should have known … may be relevant" to that litigation. *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *see, e.g.*, *Zubulake*, 220 F.R.D. at 216-17, 222 (employer who reasonably anticipated litigation sanctioned for failing to preserve emails before employee filed a complaint).

For the second element, the movant must show that the spoliating party destroyed the evidence in question "'knowingly' or 'negligently.'"  *Khaldei v. Kaspiev*, 961 F. Supp.2d 564, 571 (S.D.N.Y. 2013) (citing *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 109 (2d Cir. 2001)).  When the spoliating party acts negligently, the movant must also demonstrate that "the spoliated evidence was relevant to its claims or defenses, such that a reasonable trier of fact could find that it would support those claims or defenses." *Adorno v. Port Authority of New York and New Jersey*, 258 F.R.D. 217, 227 (S.D.N.Y. 2009).  But when the spoliating party acts in bad faith, "[r]elevance and prejudice may be presumed."  *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp.2d 456, 467 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port Authority of New York and New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012); *see also Passlogix, Inc. v. 2FA Technology, LLC*, 708 F. Supp.2d 378, 411 (S.D.N.Y. 2010) ("To have a sufficiently culpable state of mind warranting a relevance inference, the spoliator must have acted in bad faith – that is, intentionally or willfully").

Petitioner cannot satisfy the required elements.  Most significantly, no duty to preserve evidence had attached when Wadghiri reset Geraldine's Moroccan phone in June 2019 to give to his sister in Morocco.  Wadghiri had no knowledge of any potential or actual child abduction litigation at any of those junctures.  (Tr. 1229-30, 1233.)  And although, by June 2019, Geraldine had filed in Morocco both a domestic violence complaint against Guillaume and a petition for divorce, no lawsuit concerning E.J. had been filed in the United States, and neither Geraldine nor Wadghiri had received any

communications threatening litigation in the United States.[11]  To be sure, Geraldine lived

in fear that Guillaume would track her down and  that she could be accused of kidnapping.

But that does not equate to reasonable anticipation that litigation would ensue in the

United States.

Even if a duty to preserve had arisen, there is no evidence, that either Wadghiri or

Geraldine knowingly destroyed relevant evidence in bad faith.   Rather, the evidence

presented was that both Wadghiri and Geraldine acted innocently in preparing

Geraldine's phone as a gift for Wadghiri's sister in Morocco as the phone had been

rendered useless in the U.S.   Accordingly, the Court finds that Petitioner has not

established that either Respondent spoliated evidence warranting sanctions.

### 5.      Post-Trial Evidence

Following the end of trial, Petitioner moved to reopen the record to admit into

evidence several reports of supervised in-person visits between Guillaume and E.J.  (Dkt.

149.)  Similar reports had been introduced into evidence during trial as they pertained to

visits that occurred prior to the end of trial.  The reports Petitioner seeks to have admitted

post-trial address visits that occurred after close of trial and which Petitioner contends

demonstrate gradual improvement in the relationship between Guillaume and E.J.

---

[11] Petitioner has not pointed to any evidence or law that either Geraldine or Wadghiri had
any duty to preserve with respect to the European proceedings.  The day after her arrival
in New York in November 2018, Geraldine consulted with an immigration attorney who
referred her to a matrimonial / child-custody lawyer.  (Tr. 1264, 1267; P-7 at 134.)  That
lawyer, however, told Geraldine there was nothing to do given the proceedings happening
abroad.  (Tr. 1265, 1267.)  Geraldine filed her asylum application in May 2019 (P-38), but
that proceeding did not include E.J., and Petitioner has cited no authority to suggest that
that filing gave rise to a duty to preserve evidence relevant to this case.

Respondents opposed the motion, arguing that Guillaume was not diligent in procuring the new evidence inasmuch as he could have started arranging visits with E.J. much earlier than he did, that Geraldine will be prejudiced by not having the opportunity to cross-examine Guillaume about the visits or examine Dr. Goslin about them, and the reports are merely cumulative and do not go to the central issue of E.J.'s mental health and prospects if she were to return to Morocco. (Dkt. 157.) *See John v. Sotheby's, Inc.* 858 F. Supp. 1283, 1288 (S.D.N.Y. 1994) (stating factors to consider to reopen record and admit additional evidence), *aff'd*, 52 F.3d 312 (2d Cir. 1995). Respondents request that, in the event the Court accepts the new reports, it also accept a letter authored by Dr. Goslin opining on the reports, as well as additional post-trial visit reports following those submitted by Petitioner.

The Court grants Petitioner's request to admit the new visit reports, and also accepts the additional reports submitted by Respondents. Petitioner, regardless of the extent to which he was or was not diligent in seeking and commencing in-person visits with E.J., was sufficiently diligent in bringing the post-trial reports to the Court's attention following the visits on which they were based.[12] Admission of the additional reports should not prejudice Respondents inasmuch as they deem the records merely cumulative of the earlier records. And, having admitted the reports of supervised visits that took

---

[12] The post-trial records initially submitted by Petitioner span from February 15, 2021 to March 6, 2021 (Dkt. 149-1); Petitioner filed his motion on March 29, 2021.

place in the couple weeks before trial – during which E.J. was resistant to visits with Guillaume – the Court deems it in the interests of justice to admit the post-trial reports.[13]

The Court denies Respondent's request to admit the tendered letter of Dr. Goslin opining about the additional reports. Consistent with Respondents' observation that the new visit reports are cumulative, much of Dr. Goslin's letter merely summarizes what is already set forth in the reports of visits both before and after trial. And, unsurprisingly, the opinions rendered in the letter confirm what Dr. Goslin already testified to: positive interactions with Guillaume and E.J. are to be expected with a mix of both negative and positive emotions; such interactions do not take away from the fact that E.J. suffers PTSD; and returning E.J. to Morocco poses a grave risk of harm.

Moreover, Dr. Goslin opines on what is already self-evident from the supervised visit records: the visits between E.J. and Guillaume do not take place in a vacuum. Rather, they are subject to several protective measures, such as the consistent and close presence and guidance of a neutral monitor with whom E.J. feels safe; the ability of the parties' attorneys to seek court intervention or assistance in regard to the visits; this Court's having provided such assistance; and Geraldine's nearby presence and encouragement of E.J.'s visits with Guillaume.[14] Even then, the post-trial visit reports reflect both positive and negative interactions (or lack of interaction) between E.J. and Guillaume.

---

[13] The records admitted include those submitted by Petitioner as well as those conditionally submitted by Respondents and can be found at Dkt. 168-1; Dkt. 170, Exs. A and B; Dkt. 171-1; and Dkt. 178, Exs. 1-4.

[14] It is not lost on the Court that, according to the records being offered by Petitioner, E.J. generally has been reluctant to proceed with visiting with Guillaume until being drawn out by sweets, toys, and games.

Accordingly, although the Court declines to admit Dr. Goslin's letter, fairness warrants recognition as a matter of record that the additional reports of the post-trial monitored visits do not alter any of Dr. Goslin's opinions.

## Findings Of Fact

The Court turns now to setting forth its findings of fact, in addition to those already set forth above.

### A. Geraldine, Guillaume, And E.J.

Geraldine and Guillaume both were born in Morocco (Stip. ¶¶ 1-2.); Guillaume in 1979 and Geraldine in 1981. Geraldine is a citizen of Spain and Portugal; Guillaume is a citizen of France. (Stip. ¶¶ 1-2.) They went to the same high school but did not really know each other until they met on Facebook in December 2012 and started a virtual relationship. (Tr. 71-72, 544, 1688.) They met in person for the first time in early February 2013 in Switzerland, where Geraldine's mother lives, and became engaged just days later on February 14, 2013. (Tr. 70, 72; P-Chron; R-Chron.) In love, and thinking all would be well, Geraldine signed a prenuptial agreement.[15] The couple wed in France in May 2013 pursuant to French law, and later had a religious wedding in Spain in September 2013. (Stip. ¶ 3; Tr. 72; P-Chron; *see* P-3 at 89.) They set up home in the city of Casablanca in Morocco. (Stip. ¶ 4.) Geraldine became financially reliant on Guillaume, who is a

---

[15] The parties dispute the legal provisions of the prenuptial contract and whether or not it leaves anything to Geraldine in the event of divorce. (Tr. 74, 1677-80.) The contract is not in evidence, and the Court makes no finding as to what it does or does not provide.

Managing Director for a subsidiary of his family's transport and logistics company, Jacquety Enterprises.[16]  (Tr. 76-81, 1673, 2132-33.)

Guillaume was generous and provided "a very good lifestyle," including many dinners out and trips.  (Tr. 75.)  But he was in full control of the finances.  (*See* Tr. 2195 (Guillaume admitting that Geraldine had no money aside from what he provided).)  He provided a car for Geraldine to drive, and a card in his name for purchasing gas.  (Tr. 75, 79.)  He gave her an allowance of about $1,600 per month to purchase things for the home, groceries, and herself, such as clothing.  (Tr. 78-79, 662.) According to Guillaume, the allowance he provided Geraldine was almost half of his take home salary.  (Tr. 1721.) To spend that allowance, Geraldine had to use a bank card in Guillaume's name, which enabled Guillaume to monitor Geraldine's purchases.  (Tr. 79-81, 664-65.)  Sometimes Geraldine had to provide Guillaume with receipts, and sometimes Guillaume refused to pay for items that Geraldine needed "if he didn't like [her] behavior."  (Tr. 81; *see* R-367T at 7231.)  When Geraldine worked for a few months, without pay, at a make-up store financed by Guillaume, he saw her on a security camera polishing her nails and told her she should be working.  (Tr. 84-85, 667-71, 1732-36.)

On April 23, 2014, Geraldine gave birth to their only child, E.J.  (Stip. ¶ 5.)  The birth was difficult, and Geraldine had an emergency cesarean section.  (Tr. 86, 91-92, 1693.) E.J. experienced life-threatening respiratory distress, required intubation, and was in intensive care for several days.  (P-42 at 456; Tr. 92-93, 1692-93.)  As an infant and

---

[16] Geraldine testified that Jacquety Enterprises has vast influence throughout Europe, but there was no evidence of the extent of such influence beyond Geraldine's understanding. Guillaume testified that he and his family do not have political connections or influence with the police in Morocco.  (Tr. 1676.)

toddler, E.J. had a pronunciation problem for which she saw a speech therapist.  (P-42 at 459-60.)  Guillaume and Geraldine indulged E.J. to the point that E.J.'s doctor suggested the parents set stricter limits for her.  (P-42 at 458, 460.)  But, overall, E.J. was healthy.  (P-42 at 459.)

When E.J. was about three years old, Geraldine noticed that E.J. had been pulling out some of her hair and even eating it.[17]  (Tr. 151.)  At pre-school, E.J. pulled the hair of some of her classmates and bit them.  (Tr. 151-52, 647, 2137; R-471.) So, toward the end of 2016, at the age of just two-and-a-half, E.J. started seeing a child psychiatrist, named Dr. Acharabi on a weekly basis.  (Tr. 151.)  In May 2017, shortly after E.J. turned four, and following a visit to Dr. Acharabi, Geraldine reported to Guillaume that E.J. was well "except for a few small worries."[18]  (P-32 at 374.)

## B.      Tumultuous Times

Geraldine and Guillaume's relationship was marked by emotion, disagreements, fits of rage, and abuse.  As noted earlier, the parties dispute who committed the abuse, the extent of the abuse, and whether certain events even occurred.  As also noted earlier, the Court found Geraldine's rendition closer to the truth overall.

The first incident recounted by Geraldine was on the day of their religious wedding in Spain in 2013.  Geraldine's hairdresser cancelled at the last moment, so she woke Guillaume to drive her to a hairdresser near their hotel.  (Tr. 73.)  Guillaume responded angrily, in Geraldine's words "in rage," and told her to "Go fuck yourself," leaving

---

[17] Guillaume testified that he was not concerned about E.J.'s hair; although E.J. sometimes pulled out hairs, she never had missing patches or bald spots.  (Tr. 1906-07.)

[18] No records were produced from E.J.'s psychiatrist in Morocco.

Geraldine to take a cab to the hairdresser.  (Tr. 73.)  Guillaume gave a different version of events that day and did not recall any argument.  (Tr. 1684-86.)

Geraldine also described Guillaume's reaction when Geraldine told him she was pregnant with E.J.  According to Geraldine, he yelled at her that she was "not the first one trying to trap me," and demanded a blood test.  (Tr. 85-86.)  In contrast, Guillaume explained that he asked Geraldine to get a blood test because she had previously had false positives using urine tests; he had been looking forward to being a father and was very happy.  (Tr. 1686-89.)

Geraldine testified, and Guillaume denied, that while she was pregnant, Guillaume told her she was fat like a whale.  (Tr. 86, 1690.)  And, while Geraldine was recovering in the hospital after giving birth to E.J., Guillaume told Geraldine that he blamed her for E.J.'s breathing problems and having to be in intensive care.  (Tr. 92.)  Although Guillaume denied that incident, he admitted that he expressed concern that Geraldine took a shower and ate dinner after her water broke and before going to the hospital to give birth.  (Tr. 1693-94.)  Guillaume said that rather than blaming Geraldine, he blamed himself for not pushing Geraldine more to go immediately to the hospital.  (Tr. 1694.)  The Court found Guillaume's explanation less than credible.

The first instance of a violent act to which Geraldine testified, and which Guillaume denied happening (other than there being an argument) (Tr. 1697-98), occurred when E.J. was approximately one year old.  Guillaume had been working late nights, and Geraldine felt that Guillaume should be home more with the family.  One night, Guillaume promised to come home early but did not.  Geraldine called him many times.  When Guillaume arrived home, he was upset, and the two argued.  During the argument, in just

a couple seconds, Guillaume became enraged. (Tr. 94.) Geraldine was holding E.J. at the time and became afraid, so she ran into E.J.'s room with E.J. and locked the door.[19] According to Geraldine, Guillaume then proceeded to bang on the door with a hammer. (Tr. 94.) Geraldine was terrified. (Tr. 94.) She begged for his forgiveness, telling Guillaume that she was sorry. (Tr. 95-96.) Geraldine often begged Guillaume for forgiveness; she had to if she wanted to feel safe.[20] (Tr. 97.)

One flashpoint between the couple was Guillaume's use of cocaine, including in their home with E.J. (Tr. 97-100.) Geraldine said she saw Guillaume using cocaine every week (Tr. 98); at trial, Guillaume admitted to using cocaine but said he used it only four to six times during the marriage at parties with friends, and has not had cocaine in over four years.[21] (Tr. 1702-04, 1713.) Geraldine frequently confronted Guillaume about his use of alcohol and cocaine. (*E.g.*, Tr. 98-99, 105, 107-08; 112-14; R-99T at 6641; R-367T at 7220, 7255, 7277-78, 7311.) She was concerned about both Guillaume's health and E.J. (Tr. 100, 113-14.) Guillaume responded mostly by either ignoring Geraldine or

---

[19] According to Guillaume, the door did not have an operable lock. (Tr. 1698-99.)

[20] Guillaume denied that Geraldine begged for forgiveness; instead, he said that Geraldine apologized for being anxious and frustrated. (Tr. 1699.) He attributed Geraldine's conduct to hormones, "[b]ecause we know that women, after birth, still some like hormone time." (Tr. 1699.)

[21] From November 7, 2018 (after Geraldine had left Morocco) through early May 2019, Guillaume periodically had himself tested for drugs. He introduced records of urine tests showing negative results. (Tr. 1706-07; P-41.) The dates of the tests are sporadic, with noticeable gaps, including no results for the months of February, March, and April 2019. Putting aside evidentiary problems with the test result records, the Court finds the records of limited relevance given that the dates of the tests all are after Geraldine had left Morocco. (*See* Tr. 2005 (Guillaume admitting that none of the tests prove anything about his use before July 2018).) Moreover, Guillaume's own expert Dr. Favaro confirmed that urine tests are not foolproof and can be beaten in many different ways. (Tr. 2359-60.)

blaming Geraldine for his drinking and taking drugs.[22] (*E.g.*, Tr. 105, 1998.) And rather than denying use of cocaine, he denied being an "addict" because "[a]n addiction means logically that it's daily." (Tr. 109, R-99T at 6641) When Geraldine told Guillaume's mother about his drug use, Guillaume was angry and told Geraldine to not say anything to anybody and to "LEARN TO SHUT YOUR MOUTH."[23] (Tr. 113-15; R-367T at 7277-80.)

Guillaume's use of cocaine was at the center of another incident that Geraldine testified turned to physical violence by Guillaume. During summer 2015, Guillaume, Geraldine, and E.J. were staying at Guillaume's beach house. One day, Geraldine found E.J. playing with the two family dogs and a destroyed pack of cigarettes; E.J. was holding cigarette parts in one hand and a small white ball (in plastic wrap) in her other hand that Geraldine believed was cocaine. (Tr. 117.) Thinking that E.J. easily could have swallowed the purported cocaine, Geraldine was furious, started yelling, and, with E.J. in her arms, went to the bedroom to wake up Guillaume. (Tr. 119.) According to Geraldine, Guillaume responded by jumping out of bed, pushing Geraldine against the wall, slapping her, and grabbing her by the throat, all while Geraldine was holding E.J. (Tr. 119-20.) Guillaume chastised Geraldine for his having to "tolerate this miserable life you make me live with you" and said that Geraldine was merely "the egg timer that he had used to have a child." (Tr. 121.) Geraldine was shocked. The couple argued, culminating in Geraldine leaving with E.J. to stay in the family's Casablanca apartment. (Tr. 121-23.) Geraldine

---

[22] According to Geraldine, in addition to blaming Geraldine for his drug use, Guillaume sometimes also said it was due to the pressure of work and his father. (Tr. 111.)

[23] According to Geraldine, during summer 2018 while on vacation, Geraldine's mother walked in on Guillaume in a bathroom doing cocaine, and, with E.J. present, Guillaume told Geraldine's mother to "go get yourself fucked." (Tr. 250-51.) Guillaume denied any such event occurred. (Tr. 1713-14.)

testified that the following day she went to the police station to file a complaint but was discouraged from doing so by an officer. (Tr. 122-26.) Feeling lost, she returned to the beach house, apologized to Guillaume, and asked for forgiveness. (Tr. 126-27.) Guillaume testified that E.J. found his cigarettes but denied that she also found cocaine, and denied there was any incident like the one Geraldine described. (Tr. 1714-16, 1848.)

In 2016, the family moved to a house in the country. (Tr. 127.) One weekend, Guillaume was doing some work outside with E.J. and their pet dogs near him, one of which, Tom, was blind at the time. Geraldine saw Guillaume cutting with a saw. Geraldine got upset, admonishing Guillaume for cutting with a saw near E.J. and the blind dog. She accused him of being irresponsible. (Tr. 127-28.) Geraldine testified that Guillaume responded with rage and ran at Geraldine with the saw, saying "I'm going to show you what an irresponsible act is; I'm going to [c]ut you in pieces and put you in a trunk."[24] (Tr. 128.) Geraldine ran inside and locked herself in the kitchen. (Tr. 128.) E.J. saw all of this. (Tr. 128-29.) Guillaume denied that this event occurred and, in a somewhat dubious description, said that the only saw he used cannot cut your hand but can cut metallic pipes and is very slim – "[t]he same that you can use for your nails, let's say." (Tr. 1737-38.)

Geraldine talked to Guillaume about his being a "Dr. Jekyll and Mr. Hyde." (Tr. 94, 130-31, 132-33.) As she explained, Guillaume "can be the most generous, charming, lovely man in the world and in the same way he can become a monster" who is "out of

---

[24] According to Geraldine, Guillaume threatened to kill her many times. (Tr. 130.) As one example, she testified that Guillaume showed her a video of a trip he took to "No Man's Land" in Mauritania and threatened to cut her up and bury her there. (Tr. 130.) Guillaume denied making such a threat and testified that he merely made a joke to Geraldine about sending her to Mauritania where there are no shops. (Tr. 1738.)

control, in rage in two seconds." (Tr. 131-33; *see also* R-367T at 7244 (Geraldine texting Guillaume: "You have a wonderful side to you, but the violence, the rage, the wickedness take over").) And, when Guillaume becomes enraged, "he don't have any control. He can hit me very strongly." (Tr. 135.) Whenever Geraldine tried to talk to Guillaume about his rage, he did not deny what he did but instead blamed Geraldine for his actions, saying it was her fault. (Tr. 131, 137-39; 145-46, 158; *e.g.*, R-367T at 7238 ("I ask you let me sleep, no, you on the contrary you push, you push, you push until there's an explosion and then you cry"); *id.* at 7242 (telling Geraldine to "own it" – "You push, You own").) Guillaume, however, denied hitting Geraldine. (R-367T at 7246.)

Some of Geraldine's messages to Guillaume reflect her concerns about his conduct toward her. For instance, in March 2017, she told him that she was "fed up with your moods and mood swings. If you come home to insult me again in front of E.J. Shout, or worse be violent, please don't come." (Tr. 132; R-367T at 7236.) In another text to Guillaume, she referred to Guillaume's having come at her "in full force totally upset in rage."[25] (Tr. 134, 1948-49; R-367T at 7237.) Geraldine explained that she was referring to an incident where Guillaume had physically hit her for how she handled a problem with the house electricity. (Tr. 135-36.) At trial, Guillaume did not recall any such incident,

---

[25] The certified translation of the text reads "hit me with full force of rage." (R-367T at 7237.) At trial, Petitioner questioned the certified translation, and the certified interpreter translating at trial explained that the phrase in French is a figure of speech and that the better translation is the one appearing in the text above. (Tr. 1948.) The obvious import of the difference is that the revised translation does not use the word "hit." The Court's findings and decision would be the same under either translation. Moreover, certified translations of other texts from Geraldine do use the term hit in regard to Guillaume's actions. (*E.g.*, P-31 at 311 ("You hit me several times even before [E.J.]"); R-367T at 7224 ("You hit me while I was joking with you"); R-367T at 7303-04 ("You raise your hand [a]nd you've already hit me"); R-367T at 7312 ("You hurt me, insult me, assault me, hit me, I don't care anymore").)

although he did recall an argument involving Geraldine turning on electricity that Guillaume had turned off so he could connect a kitchen appliance. (Tr. 1846, 1949-50.)

A few days later, Geraldine again confronted Guillaume about his rage and violence. Geraldine told Guillaume that he was "dangerous" and asked, "do you realize the violence there is in you." (R-367T at 7239-40.) Guillaume responded, not with denial, but by changing the subject and telling Geraldine that he did not want her brother in his house. When Geraldine responded that "you're only trying to isolate me" and sarcastically said "have a good day," Guillaume responded "So, fuck you both." (R-367T at 7240.) Geraldine beseeched Guillaume to get help, to see a therapist or a doctor, "[at] least do it for E.J." (Tr. 143-44, 162; R-367T at 7240-41.) But to her knowledge, Guillaume never did so (Tr. 145), and Guillaume did not testify that he ever did so. Almost a year later, in early 2018, Geraldine again urged Guillaume to see a doctor and to "do it for [E.J.]." (R-367T at 7308.) Guillaume deflected, writing "It's over, is dead for me! … I'm not afraid either! Neither to lose you nor to lose my daughter." (R-367T at 7308.)

A pivotal incident of alleged violence occurred on June 2, 2017.[26] Geraldine and Guillaume's rendition of events are quite different. On that day, Geraldine took the dog Tom, who had been very sick, to be euthanized at the veterinarian's office. (Tr. 220-21.) At the advice of E.J.'s psychiatrist, E.J. accompanied Geraldine to say goodbye when Tom was put to sleep. (Tr. 220-21.) Guillaume did not respond to Geraldine's repeated and urgent messages asking him to meet them at the vet's office. (Tr. 221.) When Geraldine returned home with Tom's body so that he could be buried in the family's

---

[26] Just the night before and continuing the morning of June 2, 2017, Guillaume and Geraldine exchanged numerous acerbic texts about divorcing and blaming each other for alleged infidelity, lying, and more. (P-90 at 1087, et seq.)

garden, Guillaume was enraged.  (Tr. 221.)  According to Geraldine, Guillaume screamed at Geraldine that she was a murderer for killing her dog, pushed her to the garden, threw a shovel at her, and forced her to dig a burial hole.  (Tr. 222, 224.)  All the while, E.J. was nearby crying.  (Tr. 222-23.)  Geraldine could not physically dig into the hard ground, so Guillaume took the shovel back, dug, and continued to berate Geraldine.  (Tr. 224.)

Guillaume also lined the hole with a powder to prevent decomposition – Geraldine believed the powder was caustic and harmful.  (Tr. 224-29.)  She testified that Guillaume purposefully flung some of the powder at her.  (Tr. 230.)  Geraldine then insulted Guillaume and ran to the house.  (Tr. 230.)  Guillaume ran after Geraldine, grabbed her by the hair, forced her against a wall, and started kicking and beating her.  Geraldine screamed and tried to defend herself.  Again, E.J. was watching.  (Tr. 231.)  At one point, Manga, the housekeeper, intervened by jumping on Guillaume.  (Tr. 231.)  Eventually Geraldine freed herself, left the house with E.J., and drove to Casablanca city for an appointment with E.J.'s psychiatrist, and took refuge with her sister-in-law and Guillaume's brother, Christophe, with whom Guillaume has "no relations."  (Tr. 231-33, 2115.)  While Geraldine was there, Christophe called Guillaume and told him that he was out of control and dangerous and had to stop.  (Tr. 232, 238.)

Guillaume told a different story.  In his version, the hole was dug by the family's gardener; Tom was buried the following day, not the same day he died; Geraldine accidentally stepped into some of the powder, which was non-caustic lime; the two argued but there was no physical violence; and although Geraldine went with E.J. to see Christophe and his wife, Christophe never told Guillaume that he was dangerous or out of control.  (Tr. 1822-1837.)  Guillaume's version was corroborated in an important

respect by Manga.  Although Manga did not see or hear most of what transpired, she testified that she did not see any violence, did not hear Geraldine screaming, and, most critically, did not intervene at any point.  (Tr. 1587-88.)  Rather, she only saw the couple arguing and Geraldine crying because she was sad about the loss of Tom.  (Tr. 1589.) As mentioned earlier, the Court had concerns about Manga's reliability as a witness but finds that the events of that day, while contentious and emotionally violent, likely did not rise to the level of physical violence to which Geraldine testified.[27]

Geraldine recounted additional violent incidents.  For instance, she testified to an incident during summer of 2018 in which she refused having sex with Guillaume and he responded by grabbing two of her fingers with enough force to render them black and blue the next morning.  This too occurred in front of E.J.  (Tr. 255-56.)  Guillaume did not specifically address this event in his testimony.  In another incident, Geraldine had been recovering from substantial abdominal surgery she underwent in September 2018.[28]  (Tr. 257-59.)  One day in October 2018, Guillaume and E.J. were in the living room together watching television while Guillaume was eating breakfast.  Guillaume was cutting his food with a knife directly on a new tray.  Geraldine asked him to use a plate and not cut directly

---

[27] In telling his version of the day Tom died, Guillaume started with an internal contradiction.  He said that Geraldine came home crying from the veterinarian, "so obviously I'm not going to put more stress on her."  (Tr. 1820.)  But then he proceeded to do exactly that by admonishing Geraldine for not having waited for Guillaume or sent him the location of the vet, and for having brought E.J. with her.  (Tr. 1820, 1823; *but see* Tr. 2064, 2068 (inconsistent testimony from Guillaume that he criticized Geraldine about having brought E.J. to the vet *before* Geraldine arrived back home).)

[28] Guillaume paid for the surgery when insurance would not pay for it.  (Tr. 1721.)  The parties disagree, however, about whether the surgery was merely cosmetic.  (Tr. 258, 1721-23.)

on the tray. Guillaume reacted violently, holding his knife to Geraldine's stomach and telling her "I'm going to open your belly like the pig you are."[29] (Tr. 262.) Guillaume denied this event ever occurred or that he ever held a knife to Geraldine or threatened to kill her with a knife. (Tr. 1849-50.) And he denied ever hitting Geraldine. (Tr. 1849, 1950, 2010.)

Geraldine claims that E.J. witnessed Guillaume hitting Geraldine "all of her life" and "too many times to count."[30] (Tr. 267.) In response to the Court's questions to more concretely estimate the number of times Geraldine claims that Guillaume hit her in front of E.J., Geraldine answered affirmatively to "more than 20 times?," "more than 30 times?," and "more than 40 times?" (Tr. 267.) She volunteered that some portion of the incidents were when E.J. was just a baby and would not have understood what was happening. (Tr. 267-68.)

---

[29] Geraldine also testified that during the two-week period prescribed for bed rest to recover from the surgery, Guillaume refused to do grocery shopping and to take E.J. to her therapy appointments, forcing Geraldine to do so, and causing her wound to become infected. (Tr. 259-61.) Guillaume did, however, drive E.J. to and from school, which was closer and did not require driving into the city. (Tr. 260.)

[30] In her petition to New York family court for a protective order against Guillaume filed in 2019, Geraldine alleged that "the first time [Guillaume] hit me" was during the incident in which she found E.J. grasping a ball of cocaine that came from Guillaume's cigarette pack. (P-73 at 817.) That incident occurred during the summer of 2015, when E.J. was a little more than two years old. In a March 2017 text, Geraldine claimed that Guillaume had hit her even before E.J. was born. (P-31 at 311.) In his responding text, Guillaume did not deny that but instead responded "Geraldine, wake up! It was 4 years ago." (P-31 at 313.) That exchange suggests that Guillaume had hit Geraldine as early as 2013 during their first year of marriage.

Geraldine was not the only one to accuse her spouse of denigration and violence. According to Guillaume, Geraldine hit him on multiple occasions.[31] (*See* Tr. 1750, 1754; P-31 at 335 ("you hit me on several occasions").) Geraldine admitted that she slapped Guillaume once in March 2017. (Tr. 190.) On that occasion, she found E.J. emptying Guillaume's bag, the contents of which included condoms, lubricant, and a burnt plate (purportedly used for cocaine). (Tr. 190-92.) Concluding that Guillaume was having an affair, Geraldine slapped Guillaume (Tr. 192), although, according to Guillaume, Geraldine hit him exactly nine times on the chest and shoulder (Tr. 1745, 1753-54). Guillaume responded by trying to persuade Geraldine that things were not as they seemed.[32] (Tr. 192-93.) Guillaume said that he used the lubricant to prevent chafing of his upper legs while driving and that the condoms were from the bathroom.[33] (Tr. 1744; P-36 at 400; *see also* Tr. 589-90.) The Court found Guillaume's explanation somewhat dubious.

In a car ride following that incident, Geraldine saw on Guillaume's iPhone a message from a female friend in substance asking if she should send a picture of her

---

[31] Later in his testimony, Guillaume testified that Geraldine hit him on only two occasions. (Tr. 2094-95.) And, in providing information to Dr. Favaro for his report in this case, Guillaume reported that there was only one incident where Geraldine was violent or aggressive. (Tr. 2123-24.)

[32] In a text to Geraldine, Guillaume denied engaging in adultery. (R-367T at 7246.)

[33] Guillaume had a different recollection of the condoms, testifying that Geraldine believed three condoms were missing from the bathroom and therefore Guillaume must have used them with someone else. (Tr. 1754.) Guillaume did not deny or otherwise address the burnt plate.

breasts to get Guillaume to respond to her phone calls.[34]  (Tr. 193-94, 1756.)  Geraldine confronted him about it as Guillaume drove, with Geraldine in the passenger seat and E.J. in the backseat.  Guillaume testified that, while he was still driving, Geraldine proceeded to slap and punch him in the face – once close to the eyes, once on the mouth, once on the ear – and, after he stopped the car, bit his hand.[35]  (Tr. 1745-47; *see also* P-36 at 400 (day-after message from Guillaume to Geraldine accusing her of "pounding [him] with rare violence in the face" three times).)  According to Guillaume, E.J. thought that he and Geraldine were just "playing together."  (Tr. 1748.)  Following this incident, Guillaume took a "selfie" of his face, obtained a medical certificate from his doctor, and reported the incident to the police.  (Tr. 1749-50, 2103; P-36 at 402.)  The Court again found Guillaume's version of events less than satisfactory: the description of the beating he took while driving seems somewhat implausible; that E.J. thought her parents were merely playing seems unlikely if the events transpired as Guillaume described;[36] and

---

[34] The actual message, as recalled by Guillaume, suggests something more tongue-in-cheek than solicitous: "And if I send you a picture of my breasts, you answer?  Extra LOL smiley.  Although I'm sure you would prefer to receive one from your wife's, LOL.  Call me back when you can."  (Tr. 1756.)

[35] There is a seeming inconsistency in Geraldine's rendition of events about the one time she slapped Guillaume and her motivation for doing so.  She first testified that she slapped Guillaume after finding the condoms and lubricant that had fallen from his bag when E.J. was playing with it.  (Tr. 192.)  In a text, she said she slapped Guillaume because of the message from the woman offering to show him her breasts that Geraldine saw in the car ride after the condom incident.  (Tr. 217-18; R-367T at 7266.)  When confronted about the seeming inconsistency, Geraldine denied slapping Guillaume more than once and testified that the one slap came later that day after both events occurred.  (Tr. 572.)

[36] Guillaume testified that Geraldine also punched him in the chest when they were in London, about a month earlier.  (Tr. 1750-51.)  E.J. was present for that as well.  But according to Guillaume, E.J. thought the punches in London were violent (because she purportedly started to cry and said that Geraldine was scaring her), while those in the car

Guillaume did not produce a copy of the purported selfie or the medical certificate or the police report.[37]

Guillaume threatened Geraldine with his intent to file a complaint and to take E.J. away from Geraldine. (R-367T at 7247-48.) He also sent more than forty texts in the span of three days accusing Geraldine of, and "trying [to get] her to admit," beating him on multiple occasions (all of which Geraldine denied other than the one slap).[38] (Tr. 205-06, 212-17, 2114; R-367T at 7249-73.) And mirroring how Geraldine described Guillaume, Guillaume told Geraldine "In your states of rage, you don't even know what you're doing, and you don't even remember." (R-367T at 7273.) Similarly, in taking Geraldine to task for hitting him, Guillaume accused Geraldine of saying that it was Guillaume's fault that she did so (Geraldine having explained that she slapped Guillaume for being unfaithful): "it is like if I hit you in one of my tantrums, and afterwards I tried to

_____

a month later were merely play (because Guillaume and E.J. previously had played games in the car that included touching his head). (Tr. 1748, 1751.) Again, the Court did not find Guillaume's explanations to be particularly credible.

[37] Guillaume claimed that the phone on which he took the selfie broke in 2018, and it had not been a picture he thought interesting enough to save on his computer as he did with pictures of E.J. (Tr. 1749.) He claimed that he destroyed the medical certificate because he decided to give Geraldine "another chance." (Tr. 2104.) As for any record of his report to the police, Guillaume claimed to have had it expunged. (Tr. 2112.)

[38] In the lengthy text exchange in which Guillaume repeatedly accused Geraldine of hitting him, Geraldine apologized for slapping him once and repeatedly suggested that Guillaume's unfaithfulness, drug use, and verbal abuse of her were far worse than anything she did. The Court finds it curious that other than referring early in the exchange to Guillaume's hitting her on several occasions (P-31 at 311), Geraldine did not include Guillaume's physical violence in her repeated refrains about Guillaume's bad behaviors. From this and the other evidence described above and below, the Court infers that Guillaume's acts of physical violence were not as numerous as Geraldine has claimed.

say that it's your fault if I hit you." (P-31 at 351.) Of course, that is exactly what Geraldine claims in this case.[39]

The one visually documented violent act by either spouse is caught in the video mentioned earlier taken when the family was on vacation during the summer of 2018. (R-283.) Guillaume had twice directed Geraldine to stop filming, when he then suddenly struck, forcefully slapping the phone out of Geraldine's hand.[40] Despite Guillaume's fumbling for how to describe his action – violent – quick – brisk – it unquestionably was an explosive act of violence.[41] The video also corroborates Geraldine's descriptions of Guillaume as a man who can turn from charming to angry rage in just a matter of seconds (or less). And, it shows Guillaume's attempts to control what Geraldine does and what he may do if she does not obey.[42] (*See* Tr. 2012.)

---

[39] In yet another example of Geraldine and Guillaume accusing each other of similar acts, Guillaume testified that he believed Geraldine was being unfaithful because he found multiple social media accounts with Geraldine's photo but using her maiden name and portraying herself as single. (Tr. 1791-92.) No such postings were produced at trial. However, there is a lengthy text exchange from June 2, 2017 in which Guillaume accused Geraldine of having these "hidden accounts," and Geraldine admitted having social media accounts but denied what Guillaume was accusing her of. (Tr. 1794-96, 1805, 1808; P-90 at 1095, et seq.)

[40] Geraldine testified that in addition to slapping the phone out of her hand, Guillaume slapped her in the face (after the phone fell), although not very hard. (Tr. 254-55.) Guillaume denied that happened.

[41] As Dr. Favaro acknowledged, although videos introduced at trial were a non-representative sample of child-parent behavior, "you might see something on one of those videos that's so egregious that you only have to see it once." (Tr. 2319.) To be clear, Dr. Favaro was not commenting on any specific video. The Court finds the video of Guillaume's violent strike to be salient evidence, but as is evident throughout this decision, the Court relies on far more than just the video evidence.

[42] Ironically, Guillaume testified that during Geraldine's pregnancy, she once slapped his phone out of his hands when he was trying to take a picture of her at the doctor's office.

What to make of it all?  Both Guillaume and Geraldine could be explosive in their reactions.  Both displayed rage.  Both said awful things to each other.  Each accused the other of being delusional.  Each accused the other of similar aggressive conduct.  Each accused the other of deflecting guilt by falsely accusing the other of the same conduct. [43]

With respect to physical violence, there are no photos of injuries, and no medical records of injuries inflicted by either.  But Geraldine never testified that she went for medical help or took pictures of any injuries, and she did not testify that Guillaume's violence resulted in injuries warranting medical attention.  In contrast, Guillaume claimed to have received a black eye from Geraldine and suggested he had photos and medical records, yet he never identified any, and none were produced at trial.  (*See, e.g.*, Tr. 2102-04.)  There are no police reports, but again, Geraldine testified that she did not file any because she was discouraged by the police from doing so, whereas Guillaume testified that he had filed a police report and then had it expunged.

To be sure, there were inconsistencies in Geraldine's descriptions of events, and her story about Guillaume's attack on the day that Tom the dog died was contradicted by the one non-party fact witness, albeit one the Court found unreliable in many respects.  But Geraldine was largely credible, and her being a victim of abuse was corroborated

---

(Tr. 1690-91.)  Guillaume did not describe that as a violent event, and Geraldine explained how it happened accidentally.  (Tr. 88.)

[43] Guillaume testified that he and Geraldine had gone for couples counseling; that the therapist told Guillaume that she did not need to see Guillaume; and that the therapist continued with Geraldine, however, because Geraldine was transferring on to Guillaume what Geraldine did to Guillaume.  (Tr. 1807; *see also* P-90 at 1103 (Guillaume telling Geraldine that "Your psych Zohor had told me that you make a transfer on me.")  The Court has no basis to conclude whether Geraldine was engaged in transference of her own conduct onto Guillaume; there was no expert testimony on that subject.

through the text exchanges between her and Guillaume, her sessions with a therapist discussed below, the expert findings of Dr. Cling discussed below, and by the words of E.J. as told to child psychologist Dr. Goslin, also discussed below. Meanwhile, much of Guillaume's testimony was uncorroborated and laden with inconsistencies, retractions, and dubious denials.

Ultimately, the Court finds that while at times charming, generous, and loving, Guillaume also exercised financial control over Geraldine, emotionally abused Geraldine, and committed acts of physical violence toward Geraldine. The Court further finds that Guillaume has a propensity for explosive, violent rage that was directed at Geraldine and manifested in both words and actions. The Court also finds that E.J. witnessed much of the abuse. At the same time, the Court finds that there is insufficient evidence to conclude that Guillaume's acts of physical violence were as numerous as Geraldine claimed, or that any such acts caused serious physical injury.

## C.  Plans For Escape

Following the episode involving Tom the dog, Geraldine visited with E.J.'s psychiatrist, Dr. Acharabi, and spoke about Guillaume's conduct. (Dkt. 232-35.) After that, Geraldine decided that her marriage was over and that she must leave Morocco. (Tr. 235, 275, 345.) She feared for both her safety and E.J.'s safety. (Tr. 345.) Toward the end of summer in 2017, Geraldine consulted with a lawyer in Portugal to whom she was referred by a childhood friend of her mother. (Tr. 279.) Geraldine wanted to get a divorce, "anything I can get to leave my husband." (Tr. 280.)

As part of her plan to leave Guillaume and Morocco for good, Geraldine decided to start a business to try to earn money for herself. (Tr. 246-47, 275.) Guillaume financed

the business at the start, but at the same time called her a whore for letting him do so. (Tr. 246-47.)  She called the business L'Atelier d'[E.J.] ("[E.J.]'s Workshop").  (Tr. 621.) Geraldine designed the products, which started as beach towel ponchos for children; later, she developed adult versions.  (Tr. 277.)  She began selling to stores in Morocco in November 2017 and established two bank accounts.  One was for receiving payment by her customers.  The other was an account she hid from Guillaume and which she used to save some money to enable her eventually to leave.  (Tr. 278-79.)

Petitioner attempted to impeach Geraldine's version of events with evidence that, even after she decided to leave Guillaume for good, she expressed love for Guillaume as a husband and praise for him as a father.  For example, just six days after the incident with Tom the dog and Geraldine's decision that her marriage was over, she told Guillaume "I love you, you are my life, so let's stop our stupidities."  (P-90 at 1110.)  A year later, as a Father's Day present, Geraldine gave Guillaume and E.J. beach ponchos, with Guillaume's having the words "Super Dad" on the back.  (Tr. 619; P-39.)  In early July 2018, Geraldine told Guillaume that she would not let E.J. stay alone with Guillaume's parents and that "you know that I can only leave my daughter confidently with you."  (Tr. 598-600; P-35 at 384.)  Just days later, after the incident in which Guillaume purportedly swore at Geraldine's mother, Geraldine messaged Guillaume, "I miss you, my friend, my husband, my friend, my daughter's father.  I don't like going on vacation without you.  We miss you a lot."  (Tr. 597; P-34 at 376.)

Those statements are not inconsistent with Geraldine and Guillaume having a violent relationship or Geraldine planning to leave Guillaume.  Many text exchanges between the two demonstrate a pattern of conflict followed by expressions of love and

affection, particularly by Geraldine. Geraldine testified that she longed to have a loving family, and that is evident from her texts as well. Her focus was E.J., and Geraldine very much wanted to promote a loving relationship between E.J. and Guillaume. Geraldine also conceded that she said things to Guillaume at times to placate him and protect herself and E.J. even though she did not believe them to be true.[44] (Tr. 618, 724-25.)

Eventually, after the summer holiday in 2018, Geraldine developed a specific plan to escape in early November 2018 when E.J. had a school holiday and the two of them would visit Geraldine's mother in Switzerland in advance of what was to be Christmas with the Jacquety family. (Tr. 280-81.) Geraldine also started packing clothes into suitcases and hiding them.[45] (Tr. 281-82.) And then Respondent Wadghiri entered the picture.

## D.     Geraldine And Wadghiri

Wadghiri was born in Morocco but has lived in the U.S. for much of his adult life. (Tr. 1153-55.) He currently resides in New York City and has resided there at all relevant times. (Stip. ¶ 12.) He has worked at New York University School of Medicine since 1998, first as a research scientist and now as an associate professor of radiology. (Tr. 1154-55). Wadghiri's mother lives in Morocco, along with Wadghiri's brother and one of four sisters. (Tr. 1156.)

---

[44] As Dr. Cling explained, a victim's expressions of love and affection for her abuser are not inconsistent with abuse. (Tr. 1403-04, 1447-48.) Indeed, this dynamic appeared to be a recurring pattern evident from the many texts between Geraldine and Guillaume.

[45] The steps that Geraldine took to plan her departure are those that even Petitioner's expert, Dr. Favaro, recommends that a victim of domestic violence should take: talk to a counselor or therapist, make an escape plan, and start saving money. (Tr. 2363-64.)

Wadghiri's mother was a close friend of Geraldine's grandmother, and, as a result, Wadghiri and Geraldine have known each other since childhood.  (Tr. 282, 1156.)  Geraldine is very close with one of Wadghiri's sisters, Fouzia, and is considered like family to the Wadghiris.  (Tr. 1157-58.)  Until the events at issue here, however, Wadghiri and Geraldine had not seen each other since Geraldine's grandmother passed away over thirty years ago.  (Tr. 282, 284, 1156.)

In late August 2018, Wadghiri came to Morocco to visit his family, including Fouzia, who recently had gone through chemotherapy for breast cancer.  (Tr. 286, 1157-58.)  Fouzia also invited Geraldine to visit.  (Tr. 283, 1158.)  Geraldine visited five times between August 25 and September 8, 2018 (the dates of Wadghiri's arrival and departure), twice with Guillaume, and three times without (two of which were with E.J.).  (Tr. 1159, 1240.)

During a family meal at the Wadghiris, Geraldine confided in Fouzia, and more broadly to the family, about Guillaume.  (Tr. 285-86.)  Geraldine explained that her marriage was over, and that Guillaume had been abusing her, drinking, and taking illegal drugs.  (Tr. 285, 1160.)  Geraldine expressed particular concern that E.J. had witnessed yelling, screaming, name-calling, and Guillaume's "demonizing" Geraldine in front of E.J.  (Tr. 1161.)  Geraldine also said that she planned to leave Morocco and move to Switzerland to be near her family.  (Tr. 285, 1256-57.)

Following Wadghiri's return to New York, he and Geraldine texted and phoned each other.  (Tr. 1166-67.)  Their relationship took a romantic turn, and they fell into a

"virtual relationship."[46]  (Tr.  286-87, 1170-71.)  Geraldine opened up further about her problems with Guillaume, including that Guillaume "constantly belittl[ed] her, calling her a whale, fat, worthless" and other derogatory terms (including "bitch" and "cunt") in front of E.J., that Guillaume had struck her in front of E.J., and that Geraldine lived in fear of Guillaume.  (Tr. 1168-70.)  Geraldine also described the incident with Tom the dog.  (Tr. 1171.)  And, she told Wadghiri about the time she attempted to file a complaint with the police after Guillaume had slapped her, as well as her concerns about Guillaume's family having governmental influence.  (Tr. 1177-78.)

Geraldine also told Wadghiri about the plans she had been making to leave her marriage, including starting her business to save money and become independent.  (Tr. 1174-75.)  She described her plan to escape Morocco with E.J. during an upcoming school break in November 2018, when she and E.J. would be visiting Geraldine's mother and family in Switzerland.  (Tr. 1178-79.)  And, she told Wadghiri of her plans to then go

---

[46] A theme of Petitioner's case before and during trial was that Geraldine and Wadghiri allegedly started their romantic relationship well before Wadghiri's visit to Morocco in August 2018, and that Geraldine, with Wadghiri's help, concocted stories of Guillaume's violence to disguise her true motivation for fleeing to New York with E.J.: to be with Wadghiri so they could pursue their romantic relationship.  The record evidence does not support that theory; it is mere conjecture.  (*See* P-11 at 170 (Geraldine telling Wadghiri on Nov. 14, 2018 that "we are **starting** a relationship already with a lot of complications"); P-12 at 204 (Dec. 31, 2018 text from Geraldine to Wadghiri referring to their relationship of "2 months").)  Moreover, that Geraldine fell in love so quickly, and at first virtually, is fully consistent with how and how quickly she fell in love with Guillaume.  (*See* Tr. 2021-22 (Guillaume testifying about how quickly, just three weeks, after meeting in person, he and Geraldine started living together and became engaged).)  There is evidence that for some time Geraldine was not happy living in Morocco; none of her blood-relatives live in Morocco; and her mother does not visit Morocco due to an outstanding debt matter.  (Tr. 656-60, 680; *see also* Tr. 1781.)  In other words, Geraldine may have been motivated to leave Morocco for reasons other than her and E.J.s safety.  But, again, that remains conjecture.

to Portugal, along with her mother and E.J., to discuss potential divorce proceedings with a lawyer.  (Tr. 1180-82, 1198, 1245-46.)

Wadghiri decided that he would go back to Europe to visit his family in Morocco and then, with Geraldine's agreement, join Geraldine and her mother in Portugal.  (Tr. 287, 1182, 1245; Stip. ¶ 13.)  To do so, he coordinated with Geraldine's mother about dates.  On September 21, 2021, Geraldine's mother texted that she had to "organize myself at the embassy and *our* return to Switzerland," thus indicating that Geraldine, her mother, and E.J. planned to return to Switzerland after meeting with the attorney in Portugal.  (Tr. 1184-86; P-7 at 114, 131 (emphasis added).)  Indeed, Geraldine's plan was to stay in Switzerland with E.J.; she had no plan to go to New York.  (Tr. 288-89.)

Wadghiri then purchased plane tickets, expecting that he would be returning to New York on November 11, 2018, after the visit to Morocco and Portugal.  He purchased a roundtrip single fare to go to Morocco, from Morocco to Portugal, from Portugal back to Morocco, and then back to New York.  (Tr. 1187; W-1.)  Wadghiri had no intention at that point to bring Geraldine and E.J. back to New York with him.  (Tr. 1187-88.)  To the contrary, a few months earlier, Wadghiri had made arrangements for a female friend of his from France to stay with him in his apartment from November 10-16, 2018.[47]  (Tr. 1188-89.)

**E.    Point Of No Return**

Between September 21 and November 3, 2018, Wadghiri and Geraldine continued their romantic communications.  Geraldine also told Wadghiri of additional trauma that

---

[47] Wadghiri arranged for the friend to receive access to his apartment on November 10, 2018, since Wadghiri would not be returning until the next day.  (Tr. 1189.)

she experienced from Guillaume, including his making her drive shortly after her stomach operation despite doctor's orders, and an incident, with E.J. present, in which Guillaume had held Geraldine at knife-point, threatening to cut her open.  (Tr. 1190-94.)  And by September 30, 2021, Geraldine and Wadghiri had fallen in love and were fantasizing about a shared life together in New York, and messaging about the prospect of having sex.  (Tr. 1346-47, 1352-53, 1360-61; P-54 (Sept. 26, 2018 love letter from Geraldine); P-50 at 730 (Sept. 30, 2018 WhatsApp message to Geraldine).)

On November 3, 2018, Geraldine left Morocco with E.J. and, as planned, flew to Switzerland.  (Stip. ¶ 6.)  They were ticketed to return to Morocco on November 11, 2018.  (Stip. ¶ 7.)  On November 5, 2018, Geraldine and E.J. flew to Portugal.  (Stip. ¶ 11.)  As planned, Wadghiri traveled to Morocco, ultimately meeting Geraldine and her mother in Portugal the same day they arrived.  (Stip. ¶ 14; W-1.)  He joined them for the meeting with the Portugal lawyer on November 7, 2018.  (Tr. 291, 1197.)  At the meeting, Geraldine explained that she wanted to initiate a divorce, have it be as amicable as possible, and to be able to live with E.J. in Switzerland near her family.  (Tr. 1198.)  The lawyer noted the many countries whose laws potentially were in play,[48] and explained that absent Guillaume's agreement to the living arrangement, "there is nothing stopping him from coming and snatching E.J."  (Tr. 1199-200.)  The lawyer then recommended that, to be protected, and given Europe's porous borders, Geraldine should leave Europe

---

[48] As Wadghiri described, the lawyer scratched his head while noting that Guillaume is French; Geraldine is Portuguese and Spanish and a resident of Morocco; their marriage is under French law; but their prenuptial agreement is written by a Moroccan lawyer.  (Tr. 1199.)

"immediately" and go elsewhere such as Canada or the U.S. (Tr. 1201; *see also* Tr. 294-95.)

Upon leaving the lawyer's office, Geraldine and her mother were crying; Geraldine was terrified; she felt confused and unsafe in her own country. (Tr. 294-95.) Geraldine's mother then asked Wadghiri if Geraldine and E.J. could stay with Wadghiri "for a little while, while we settle this matter." (Tr. 1202; *see also* Tr. 295.) Wadghiri felt panicky and viewed the immediate situation as an emergency. (Tr. 1202.) Spontaneously, he said yes, without having any idea how long the living arrangement would last. (Tr. 1202-03.) Geraldine's mother offered to cover any costs, but Wadghiri said there was no need to do so. (Tr. 295-96, 1203.)

In need of plane tickets for Geraldine and E.J. to go to New York, the group headed directly to the airport. (Tr. 295, 1203.) Geraldine and her mother purchased tickets for Geraldine and E.J. to fly to New York the next day, November 8, 2021. (Tr. 295-96, 1204, 1356.) Wadghiri also booked a ticket for November 8, even at the loss of the ticket he already had purchased for November 11, which could not be exchanged given the last-minute timing. (Tr. 1204; W-2.) On November 8, 2018, Geraldine, E.J., and Wadghiri flew to New York, where Geraldine and E.J. moved in with Wadghiri in his three-bedroom apartment.[49] (Stip. ¶¶ 15-16; P-Chron; Tr. 298.)

---

[49] Shortly before coming to New York, Geraldine, with the help of her mother, obtained a Portuguese passport for E.J. (Tr. 555.) Contrary to Petitioner's suggestion that Geraldine did so for some underhanded purpose, E.J.'s travel documents to fly to New York show that Geraldine used only E.J.'s French passport to facilitate travel. (W-5, W-8; *see also* Tr. 297-98, 554-55.)

**F.    Geraldine, E.J., And Wadghiri In New York**

On November 11, 2018, Geraldine sent Guillaume an email informing him that she and E.J. would not be returning to Morocco and that they could no longer endure his abuse. (Tr. 299-300; R-18T.) Geraldine also promptly enrolled E.J. in school, where E.J. did well and developed friends. (Tr. 306; P-37 at 405.)

In the days after arriving in New York, Geraldine was anxious, panicky, and fearful. (Tr. 301, 1207-09.) She felt isolated and lonely as Wadghiri was busy with work and maintained his social life. (Tr. 1312, 1320.) She was afraid that Guillaume would track her down and take E.J. away. (Tr. 1217.) Within the first week, Geraldine experienced a panic attack, feeling like she could collapse at any moment, and Wadghiri took her to Bellevue Hospital. (Tr. 302-03, 1208, 1210.) Bellevue scheduled her to see a Victim Services Program social worker named Darwin Rodriguez.[50] (Tr. 304, 1211; R-064 at 4026.)

The next day or so, Geraldine and Wadghiri exchanged WhatsApp messages in which Geraldine expressed anxiety and powerlessness that was prompted by Guillaume's insistence about coming to see E.J. Having been successfully "tricked" by Geraldine (Tr. 1321-23), Guillaume believed that Geraldine and E.J. were still in Switzerland. During the exchange, Wadghiri advised Geraldine not to engage with Guillaume and to "[m]ake

---

[50] The notes of Geraldine's first visit to Bellevue are not fully consistent with Geraldine and Wadghiri's testimony about a panic attack being the impetus to an unplanned visit to Bellevue. The notes state that Geraldine "obtained information about the Victim Services Program (VSP) from a friend" and there is no mention of a panic attack in the November 15, 2018 entry. (R-064 at 4026.) There may be some cohesive explanation for that, but the issue was not addressed on Geraldine's examination. The apparent inconsistency, however, remains one of several that caused the Court to find Geraldine less than fully credible, despite being considerably more credible than Guillaume.

him believe that you are the victim until you win." (Tr. 1223-24.) Wadghiri explained that he so advised Geraldine because he understood that Guillaume would leave Geraldine alone whenever she played the victim and that engaging with Guillaume would only make things worse. (Tr. 1222-24.) And, by "win," Wadghiri meant resolving the divorce, protecting E.J., and moving on with her life. (Tr. 1322-23.) The Court found this explanation largely credible despite Petitioner's contention that the exchange evidences that Geraldine was not actually victimized by Guillaume and instead had orchestrated a ruse to cover her illicit abduction of E.J. Later in the WhatsApp exchange with Wadghiri, Geraldine stated that she would "only raise my head in front of [Guillaume] to finish him off," which Wadghiri understood to refer to Geraldine's frustration with Guillaume's attitude toward the divorce and E.J. (Tr. 1325-26.)

Further in their exchange of messages, on November 16, 2018, Wadghiri wrote to Geraldine "You must say it all to the psychotherapist. This will be useful for the judge." (Tr. 1327.) By "judge," Wadghiri was referring to Geraldine's divorce and custody matters. (Tr. 1327.) Again, Petitioner suggests that this exchange shows that Geraldine's story of domestic violence is a sham. But as Wadghiri explained, he simply meant that Geraldine should tell her therapist (from Bellevue) about her fears, anxiety, and other feelings, and that doing so would be proof of her trauma and useful in the divorce. (Tr. 1327-29.)

Geraldine continued to experience constant anxiety and fear that somebody would harm her and take E.J. away. (Tr. 1277-78.) Her distress often occurred before and after speaking with Guillaume. (Tr. 1222.) She also had emotional flare-ups with Wadghiri, to the point where Wadghiri accused Geraldine of "constant harassment" and responding to a simple question with "a nonstop tirade." (Tr. 1342; P-12 at 207.) In an exchange of

messages with Geraldine's mother on March 22, 2019, Wadghiri wrote about difficulties with Geraldine.  Wadghiri stated that "[s]ometimes she pushes me to the limit."  (Tr. 1276-77; P-7 at 138.)  Wadghiri was "aware that [Geraldine] needs reassurance" and that Geraldine "feels vulnerable.  After all, it is a difficult situation.  I try, but there are times it's hard to take the punches.  Much to her credit, she apologizes, but it's regular."  (Tr. 1279; P-7 at 138.)  In writing that message, Wadghiri was not referring to physical punches, but rather verbal punches in the sense that Geraldine would say things about Wadghiri not doing enough or being out with friends; Wadghiri "took them as punches because I was trying to do my best to try to support and help and comfort her and calm her down."  (Tr. 1280.)  In words echoing Geraldine's own descriptions of Guillaume, Wadghiri wrote that "Geraldine is a gem of kindness and generosity with a flame of frustration ready to explode [emotionally] at any moment."  (Tr. 1281; P-7 at 138.)

In April 2020, Wadghiri and Geraldine ended their romantic relationship.  (Tr. 326-27.)  Even so, Geraldine and E.J. continued to live with Wadghiri in his apartment.  (Tr. 327; Stip. ¶ 16.)  Throughout Geraldine and E.J.'s stay with Wadghiri, he has paid for some of Geraldine's living expenses, including food, utilities, and occasionally going out, and for some of E.J.'s extra-curricular activities; Geraldine's mother, brother, and some friends pay for other things, such as clothing and toys or anything for E.J.  (Tr. 331, 1354-55, 1367.)  Wadghiri also has paid for some of Geraldine's legal fees, including for an immigration lawyer, who advised that an asylum application would be the most advantageous option for Geraldine because of her having been subject to domestic

violence (Tr. 1284, 1287),[51] and a lawyer who helped her file for an order of protection in family court (discussed further below).  (Tr. 1358.)

## G.      Legal Filings and Suspicions

In February 2019, believing Geraldine and E.J. to still be in Switzerland, Guillaume filed a Hague Convention petition for E.J.'s return in Switzerland.  (P-1 ¶ 20 and Ex. F.) That same month, an attorney in Morocco filed a domestic violence complaint against Guillaume in criminal court on Geraldine's behalf.  (Tr. 423; P-Chron; P-79.)  Guillaume filed his own criminal complaint against Geraldine in Switzerland.  (R-33T.)  And, in April 2019, Geraldine's attorney filed a petition for divorce from Guillaume in Morocco. (Tr. 423; P-Chron; P-28.)

In early July 2019, Guillaume learned that Geraldine and E.J. were in New York. (Tr. 1922.)   In August 2019, a couple weeks after returning from a vacation with Geraldine's mother, Geraldine discovered that Wadghiri's apartment had been burglarized but the only missing items were Geraldine's jewelry.  (Tr. 311-12, 318.)  The following month, Geraldine heard from her brother, who had dinner with Guillaume, that Guillaume knew what the wallpaper of E.J.'s bedroom in New York looked like.  (Tr. 316-19.)  Geraldine was terrified that Guillaume knew where she lived and, on October 22, 2019, obtained an order of protection in New York family court.  (Tr. 319-20, P-73.)  Efforts to serve the order of protection on Guillaume in Morocco were not successful.  (Tr. 321.)

---

[51] Geraldine filed her asylum petition on May 10, 2019.  (P-Chron; P-38.)  For some reason that was never explained, the asylum application contains a check in the box indicating that E.J. is not covered by the application.  Geraldine testified that she did not know if the asylum application covered E.J.  (Tr. 552-53.)

Then, on October 4, 2019, to confirm his belief as to exactly where Geraldine and E.J. were staying, Guillaume had flowers delivered to Wadghiri's apartment, along with a teddy bear.  (Tr. 321-22, 1926-28.)  Geraldine perceived the flower delivery as a threat, describing an incident, denied by Guillaume (Tr. 1928-29), years earlier when Guillaume had sent her flowers with a headless teddy bear.  (Tr. 322-23.)  On October 18, 2019, Guillaume filed the instant Petition.  Four days later, under the guise of having Guillaume visit E.J. while he was in New York for initiation of this action, Geraldine had Guillaume served with the family court order of protection against him.  (Tr. 325-26, 1900-03.)

## H.    The Moroccan Judgment

On June 16, 2020, the Moroccan court issued provisional orders granting physical custody of E.J. to Geraldine with a right of visitation by Guillaume in Casablanca, joint "parental authority," and child support.[52]  (P-3 at 94.)  Further proceedings were held in the Moroccan court.  Guillaume appeared and submitted evidence.  Geraldine's Moroccan counsel requested multiple extensions of time, the last of which was denied and following which Geraldine's counsel submitted no evidence.

On January 26, 2021, the Moroccan court issued a judgment with a far different result than the provisional orders (the "Moroccan Judgment").  (See Dkt. 206 at 11-21 (certified translation).)[53]  The Moroccan Judgment found that Geraldine had forfeited her

---

[52] Petitioner accused Geraldine of lying to Dr. Cling about her and Guillaume's custody rights.  The Court does not agree.  Geraldine generally was confused about legal matters and proceedings in Morocco.  (See Tr. 1506-11.)  Moreover, the parties' lawyers disagreed about the import of the provisional Moroccan orders.

[53] January 26, 2021 was the second day of trial in this matter.  Guillaume, and his attorneys in this case, learned of the Moroccan Judgment and its outcome that same day; Guillaume received a certified copy of the Moroccan Judgment on February 15, 2021,

custody rights and awarded physical and residential custody to Guillaume, permitting Geraldine visitation, absent agreement otherwise, only in Casablanca at Guillaume's residence and only on Saturdays and Sundays from 9:00 a.m. to 6:00 p.m.  Relying on the submissions made by Guillaume, the Moroccan Judgment found that Geraldine had wrongfully and "irresponsibly" removed E.J. from school and secretly taken her out of Morocco.  The Court further found that Guillaume has a "material and stable situation" and "the means to guarantee … assurance of psychic and physical stability of the child." (Dkt. 206 at 19.)  And, the Court suggested that Geraldine could be imprisoned for child abduction.  (Dkt. 206 at 18-19.)  As noted, however, the Court based its decision solely on the narrative and evidence submitted by Guillaume.[54]

---

and his attorneys received an unofficial translation the following day, February 16, 2021. Despite having this information, Petitioner did **not** bring it to the Court's attention at any time; nor did he apprise Respondents, perhaps believing, mistakenly, that they knew of it as well.  Rather, the Court learned of it only on April 21, 2021, when Respondents' counsel brought it to the Court's attention shortly after they learned of its existence on April 15, 2021 in a phone discussion with Petitioner's counsel.  (*See* Dkt. 180.)  On April 30, 2021, the Court held a conference during which Petitioner's counsel explained that they did not apprise the Court of the Moroccan Judgment because they believed it was irrelevant and because it issued after trial.  The first excuse is spurious; even though this Court is not rendering a custody decision, the Moroccan Judgment is relevant as it addresses the conditions to which E.J. would be subject upon returning to Morocco, and which could affect her PTSD.  Moreover, Petitioner saw fit to include as his Exhibit 3 the Moroccan court's provisional custody ruling.  (Ex. P-3.)  The second excuse is disingenuous; after all, Petitioner's counsel made a post-trial motion to admit additional records of Guillaume's visits with E.J. as discussed above.  In other words, when considering post-trial evidence to be favorable to Petitioner, counsel apprised the Court and asked to admit that evidence.  Petitioner certainly need not offer into evidence material that he deems adverse to his case, but the duty of candor to the tribunal suggests that Petitioner's counsel should have at least brought the Moroccan Judgment to the Court's attention; at the very least, Petitioner should have apprised Respondents so that they could do so.

[54] The Court takes judicial notice of the Moroccan Judgment (and the provisional judgment).  *See* Convention, art. 14 ("In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative

## I.    Guillaume And E.J.'s Relationship

Guillaume's relationship with E.J. can be divided into two time frames: the period before Geraldine left Morocco for good with E.J., and the more than two-year period since then.

### 1.    Guillaume And E.J. Before Geraldine's Departure

Guillaume indisputably loves and has always loved his daughter.  (*See* Tr. 614;  P-90 at 1087 (Geraldine telling Guillaume "I know that you love [E.J.] and she loves you").)  Although Geraldine was and is E.J.'s primary caregiver and tended to all of E.J.'s needs during her infant years, Guillaume enjoyed playing with E.J. and doing "everything together" with her on the weekends.  (Tr. 1852.)  Photos and videos from 2018 and earlier depict many happy times of Guillaume and E.J. together.  (*E.g.*, P-4.)

Geraldine testified that she has never seen Guillaume hit or hurt E.J.[55]  (Tr. 163-64; *see also* Tr. 771.)  She did testify, however, that in October 2018 Guillaume bathed naked with E.J., and intended to do so even when he had had a blood test showing that he had a sexually transmitted disease.  (Tr. 263-65.)  Guillaume denied that he bathed

---

authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable").

[55] Geraldine testified that she had seen Guillaume "lose control" with E.J. and provided two examples.  The examples, if true, may suggest questionable parenting, but not fits of rage directed at E.J.  (*See* Tr. 163-65 (Guillaume telling E.J. that she was a bad girl for drawing with a marker on his car, and telling E.J. that she was stupid for how she was brushing her teeth and would "finish with piss.").)  Guillaume denied the first example, testifying that he was not angry with E.J., and did not recall the second purported incident, although did recall laughing with E.J. about cat pee.  (Tr.1742-43, 1777.)

completely naked with E.J.; rather, he did so with his underwear on.  (Tr. 1867.)  He did not deny or address the blood test.[56]

## 2.  Guillaume And E.J. After Geraldine's Departure

After coming to New York, Geraldine called Guillaume on a weekly, though irregular, basis so that he could briefly speak with E.J., even though she did not reveal where they were.[57]  (Tr. 1876-78.)  In February 2019, however, Guillaume stopped taking the calls and refused to speak with E.J. for approximately the next two months.  (Tr. 341, 1877-78.)  As described earlier, he did not provide a credible explanation for his refusal. He finally resumed taking calls only after Geraldine beseeched him to do so on E.J.'s birthday.  (Tr. 341, R-19 at 6807.)

E.J. generally was a willing participant in the FaceTime calls with Guillaume for some period of time.  In September 2020, however, calls with E.J. became, as Guillaume put it, "weird."  (Tr. 1896-97, 2168-69.)  E.J. said things Guillaume did not like hearing, and Guillaume told E.J. she was "mean" and "not nice" for the way she was acting.  (Tr.

---

[56] This incident resulted in another purported act of rage and violence, with Geraldine intervening to prevent Guillaume from bathing naked with E.J., and Guillaume throwing an "alum" deodorant stone at Geraldine, nearly missing her head.  (Tr. 266.)  Guillaume denied throwing the alum at Geraldine, testifying that it accidentally fell out of its case to the floor.  (Tr. 1741.)

[57] In response to Guillaume's question during an early February 2019 call asking E.J. where she was, Geraldine prompted E.J. to say they were at her grandmother's (in Switzerland).  (Tr. 1880-81, 1885-87.)

1897, 2213-16.)  E.J. even said she was going to kill Guillaume.[58]  (Tr. 1898, 2168.)  She became resistant and did not want to talk with Guillaume.[59]  (Tr. 1897.)

The visits became sufficiently problematic that the parties eventually agreed that appointment of a neutral supervisor to facilitate FaceTime calls between E.J. and Guillaume would be in the best interest of E.J. and the parties.  (Dkt. 110.)  Petitioner, however, refused to pay for the cost of the supervisor until ordered to do so by the Court, without prejudice to seeking recovery of costs at the conclusion of the case.  (R-447-5.)

### 3.     Guillaume's In-Person Visits With E.J.

Guillaume did not have an in-person visit with E.J. until on or about January 31, 2021, well after he arrived in New York for trial of this matter.  Exactly why Guillaume did not arrange to visit E.J. at an earlier juncture was a subject of some controversy at trial. The issue of whether Guillaume could have supervised visits with E.J. was discussed but not resolved at the hearing before Judge Marerro on October 25, 2019.  (Tr. 2141.)  At the hearing, Geraldine's counsel stated that "we would absolutely consent to supervised visitation on a regular basis.  We have no intention of preventing this father from seeing his daughter."  (Tr. 2141-42.)  Guillaume's attorney indicated that the parties were at an impasse as to who would pay for cost of supervision for the visits with Guillaume, even just $600 for three hours.  (R-447-5 at 21-22.)  Guillaume's explanation for why he did not agree to do so was suspect.  He first said that he "didn't get the point" of having to have

---

[58] In or about December 2020, E.J. made two drawings that reflected anger and violence toward Guillaume.  (R-455; R-456.)

[59] Even before the period Guillaume described as becoming "weird," there were FaceTime calls where E.J. was resistant or upset with Guillaume but to a lesser degree. (*See* Tr. 2169-72, 2207.)

supervision for visits with E.J., but then shifted to saying he did not recall if his lawyers explained to him that he could see E.J. if he paid for cost of supervision. (Tr. 2142-45.) The Court finds it hard to believe that they would not have done so.

Less than two weeks later, on November 5, 2019, the parties entered into a so-ordered stipulation in family court permitting Guillaume daily FaceTime access with E.J. (R-268.) The stipulation was without prejudice to Guillaume's right to request supervised in-person visits. (R-268 at 2.) Guillaume never made such an application (until trial),[60] and claims to have been confused about what his rights were in that regard. (Tr. 2146-50, 2233-34.) The Court appreciates that Guillaume has no legal training and cannot be expected to understand the ins and outs of U.S. legal proceedings, but he has very capable lawyers who no doubt advised him of his rights and options. Indeed, in January 2020, Guillaume's lawyers did just that, proposing to Guillaume a visit between him and E.J. (P-44 at 596.) Of course, as Guillaume noted at trial, because of the coronavirus pandemic, he could not leave Morocco to come to the U.S. between March 2020 and January 2021.

In any event, since the end of January 2021 Guillaume and E.J. have been having limited, supervised in-person visits. The parties emphasize different aspects of the supervisor reports of those visits. Petitioner asserts that the reports show progressive healing of the relationship between father and daughter following two years of physical separation. Respondents contend the reports demonstrate continuing reluctance and fear in E.J., which is allayed in part only by plying her with sweets and toys. From the

---

[60] *See* Tr. 2239 (Guillaume planned to wait until trial of this matter to ask the Court for permission to visit E.J. when Guillaume came to New York for trial).

Court's perspective there appear to be elements of both dynamics.[61]    Particularly significant for present purposes, however, is that any tentative progress being made in the visits has been only with help and oversight of a supervisor with whom E.J. feels safe, access to this Court and family court for adjustment of rights in the absence of agreement, and encouragement from Geraldine.

Indeed, Geraldine has steadfastly encouraged E.J. to speak with Guillaume and supported her visits with Guillaume, even when E.J. was resistant.  (Tr. 340-41, 344, 1303-05, 2172; *see, e.g.*, R-466, R-467, P-49 at 673.)  Petitioner's attempt to portray Geraldine otherwise fell flat.  For example, Petitioner highlighted the video of a December 2020 FaceTime call between Guillaume and E.J. where Geraldine went into a loud, lengthy verbal tirade using what Guillaume calls her "hysterical voice."  (Tr. 2271.)  The trigger to Geraldine doing so, however, was Guillaume telling E.J. that he was not allowed to visit her and repeatedly telling Geraldine that she was a liar for saying he could.  (Tr. 2237-38; P-107.)  While that does not excuse Geraldine's behavior during the call, Geraldine was far more correct than was Guillaume.  And contrary to Guillaume's attempt to portray Geraldine as the protagonist who was not providing encouragement to Guillaume's relationship with E.J., Geraldine assured E.J. that Guillaume would come to

---

[61] *Compare, e.g.*, P-138 (Feb. 27, 2021 supervisor report: "[E.J.] continues to do better in each visit as evidence[d] by her interaction with [Guillaume]") *with, e.g.*, Dkt. 170-2 at 4 (March 27, 2021 supervisor report: "[E.J.] does not return [Guillaume's] affections toward her.  [Supervisor] observed that with [Geraldine], [E.J.] is affectionate, easy-going, and reciprocated [ ] hugs, and kissed, however wi[th] [Guillaume], [E.J.] is guarded, defiant, and does not return [Guillaume's] affections unless it is forced or by the use[ ] of bribes. [E.J.] continues to look for [Supervisor] when she is uncomfortable and overwhelmed with [Guillaume's] presence").

see her if he could.  (Tr. 2243 ("Your daddy, if he could come to see you, he would have come 100 times already")).)

Ever since Geraldine and E.J. have been in New York, Guillaume has not provided any money for child support – not for clothes, food, school activities, or anything else.  (Tr. 331, 2218-19.)  The Court understands why Guillaume may have been reluctant to do so, given that Geraldine had absconded with E.J. and then obtained a protective order against Guillaume.  But the Court did not find credible Guillaume's explanation that he thought the protective order prevented him from providing gifts, funds or other support for E.J.[62]  (Tr. 2226-31.)   Guillaume easily could have done so through his lawyer and Geraldine's lawyer.  (See Tr. 2231-32 (Guillaume admitting his lawyers never told him he could not send money for E.J.'s support).)

## J.  Geraldine's Treatment With Social Worker Darwin Rodriguez

From the time Geraldine first met social worker Darwin Rodriquez at Bellevue Hospital the day after her first panic attack in New York, Geraldine continued to regularly see Rodriquez for treatment on roughly a weekly basis.  (See R-64 (Rodriquez's notes of sessions with Geraldine from Nov. 16, 2018 through March 31, 2020).[63])  The records of Rodriquez's sessions with Geraldine are significant in at least three respects.  First, they document, in sessions unfolding over approximately a year and a half, Geraldine's historical recitation of events that generally are consistent with what she told others

---

[62] The Court takes no position on whether Guillaume was legally obligated to provide child support under the current circumstances.

[63] According to Geraldine, she stopped seeing Rodriquez because he was in poor health. (Tr. 305.)

(Wadghiri, Dr. Cling), with electronic messages introduced into evidence, and with her testimony at trial.[64]  While the Rodriquez notes are based on Geraldine's version of events, they indirectly corroborate her testimony.[65]

Second, Rodriquez reported Geraldine's feelings and state of mind.  Geraldine was "visibly scared" and "visually anxious and fearful."  Geraldine reported having bad days and good days, but much of the time expressed anxiety and fear. She frequently reported having nightmares and difficulty sleeping.  She repeatedly emphasized her concern about E.J.'s happiness and well-being.  She felt bad when Guillaume discontinued speaking with E.J., and expressed concern about what Guillaume said to E.J. when they did speak.  She struggled with accepting that she was a victim of abuse, and with guilt that she did not leave sooner in their relationship.  And, as much as she wanted to be free of Guillaume, Geraldine hoped that he could be a part of E.J.'s life for

---

[64] The Court noted at least one seeming inconsistency between what the Rodriguez session notes indicate Geraldine reported to him and what Geraldine testified to at trial. Specifically, Geraldine told Rodriguez about the theft of her jewelry from Wadghiri's apartment.  (R-64 at 4041.)  The notes indicate that Geraldine was upset "primarily because some of the pieces had sentimental value," and that she became angry with Wadghiri because he could not recall if he left the safe open.  The focus of the theft during Geraldine's testimony, however, was that she believed the theft may have been orchestrated by Guillaume as a sign that he knew where she resided.  (Tr. 311-12.)  No mention of that concern appears in Rodriguez's notes.

[65] A liar can, of course, tell the same lie to multiple persons at multiple times, which does not make the lie any more true.  Indeed, Geraldine did exactly that in misrepresenting the point when she decided to leave Morocco on several different governmental documents. Although Geraldine at times likely exaggerated and embellished, the Court finds it highly unlikely that Geraldine created out of thin air her entire narrative of multifaceted abuse over multiple years that remained consistent as told to different persons (Wadghiri, Rodriguez, Dr. Cling) in different contexts (friend and lover, social worker in regular sessions, and expert forensic / clinical psychologist) at different times (shortly before leaving Morocco, over a year-and-a-half period after arriving in New York, and expert evaluation for trial).

E.J.'s sake.  Geraldine said that she could not go back to Morocco, and feared that if she did, Guillaume would ruin E.J.'s life.  (R-064 passim.)

Third, the notes include no mention or suggestion that Rodriguez had any concerns about the truth or falsity of what Geraldine reported.  He repeatedly validated her feelings, consistently instructed her on exercises to ease her anxiety and flashbacks, and involved her in volunteer work for victims of domestic violence.  As a social worker, Rodriguez's job no doubt was to provide emotional support and validate his patients' feelings.  Whether he harbored any doubts about what Geraldine reported to him, the Court cannot say.  But there is no indication of any doubts in his notes.

## K.    Mental Health Expert Opinions

As previewed earlier, three psychological experts testified at trial: Respondents' experts Dr. Goslin and Dr. Cling, and Petitioner's expert Dr. Favaro.  Dr. Goslin is the only expert who evaluated E.J. and testified about E.J.'s condition and risk of harm.  The Court discusses Dr. Goslin's and the other experts' opinions at length given their import.

### 1.    Dr. Goslin

Dr. Goslin is an experienced clinical psychologist and an associate research scientist at the Childhood Violent Trauma Center at Yale University School of Medicine's Child Study Center.  (Tr. 778-79; R-449-1.)  She specializes in assessing and treating children and other victims of potentially traumatic experiences and has extensive experience working with children exposed to domestic violence.  (Tr. 785-86.)  The Court accepted, and Petitioner stipulated, that Dr. Goslin is an expert in child psychological assessment and intervention concerning childhood trauma and comprehensive psychological assessment in the field of child psychology.  (Tr. 794-95.)

In brief, Dr. Goslin concluded that E.J. was exposed to domestic violence by her father toward her mother on multiple occasions. (Tr. 851.) Dr. Goslin determined that there is "clear and compelling evidence" that E.J. suffers from PTSD (Tr. 1135), and opined that E.J. is at serious risk of an increase in her PTSD symptoms and negative impact on her development if she were to return to Morocco (Tr. 779). The Court found Dr. Goslin credible, and her opinions reliable.

In reaching her opinions, Dr. Goslin employed reliable methodology. She assessed both trauma exposure and trauma reactions or symptoms. (Tr. 803.) She conducted structured interviews of both E.J. (twice) and Geraldine (four times); she also observed E.J. and Geraldine together.[66] (R-499-1 at 002.) Dr. Goslin administered well-established instruments, including both a Trauma History Questionnaire (focusing on trauma exposure), which Dr. Favaro agreed has "known validity and reliability" (Tr. 2322), and the Young Child PTSD Symptom Checklist (focusing on trauma reactions and symptoms), and she employed the peer-reviewed American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (known as "DSM-5") for diagnosis. (Tr. 805, 807-808, 827.) She considered multiple sources of data, including the interviews, hours of videos recording interaction between E.J. and Guillaume, early medical records from Morocco, email narratives written by Guillaume to his lawyer and Dr. Favaro, and more. (Tr. 814, 818-19, 822, 868-71.)

---

[66] Petitioner faults Dr. Goslin for not recording the interviews. As is her regular practice, however, Dr. Goslin took notes during interviews but did not video or audio record. (Tr. 814-15.) Recording interviews can make participants guarded and self-conscious thereby interfering with rapport and gathering necessary information. (Tr. 815.) Dr. Cling similarly did not record her interviews of Geraldine, indicating that recording interviews of this nature is not the usual practice. (Tr. 1539.)

The "most compelling source" of information that E.J. was witness to domestic violence was E.J. herself. (Tr. 1070.) During Dr. Goslin's interviews of E.J., E.J. described what Dr. Goslin categorizes as three forms of violence: physical violence, psychological violence, and damage to property. (Tr. 962.) E.J. directly reported that her dad "smacked" her mother many times, used bad language, yelled, was verbally abusive, and broke things in the home.[67] (Tr. 833-34, 839, 841, 988-90.) According to E.J., incidents of this nature happened a lot and made her feel "really bad." (Tr. 834, 840.) E.J. blamed her father "because [mommy] didn't do nothing"; "He kept smacking her, but she never does something. She cry." (Tr. 847, 995-96.) E.J. felt "bad" and worried for her mother's safety, "because she's my mom and no one can touch her like that." (Tr. 842, 961, 1001.) While recounting those experiences, E.J. displayed fear and anger. (Tr. 841, 847.)

Based on her discussions with both E.J. and Geraldine, Dr. Goslin found that E.J. exhibited certain trauma-related symptoms that are "common manifestations of trauma response when a child has witnessed one parent harming another parent." (Tr. 878.) In other words, E.J.'s symptoms are consistent with those exhibited by children exposed to

---

[67] The record is replete with incidents of Guillaume imposing psychological violence on Geraldine. (*E.g.*, R-367T at 7221 ("I'd rather be alone than having a wife like you!"); R367T at 7233 ("little bitch"); Tr. 246-47 and R367T at 7304 ("whore"); R-99T at 6617 ("You're just here to ruin my life!"); R-99T at 6640 ("crazy bitch").) To a lesser degree, Geraldine doled out her share of insults to Guillaume, such as calling him "stupid" (P-90 at 049) and accusing him of acting childishly (P-90 at 047). But her texts were not laced with the same virulent denigration as Guillaume's messages, and as reflected in their various exchanges, Geraldine repeatedly expressed her desire for Guillaume to get help, to save himself, and to foster and preserve a loving family, whereas Guillaume did not reciprocate. As Dr. Goslin explained, exposure to psychological violence of one parent by the other can be a cause of PTSD no less than exposure to physical violence. (Tr. 963, 965.)

domestic violence. (Tr. 878-79.) E.J.'s symptoms include trauma avoidance, hypervigilance and heightened startle, which "is a common PTSD reaction that develops following exposure to domestic violence." (Tr. 856, 875-76.) E.J. also experiences intrusive memories. (Tr. 873-74.) Reminders of what happened in the past give E.J. a "bad feeling." (Tr. 858-59.) She tried to forget "like 100 times, but it didn't work. I try to forget all day long, but it always comes back." (Tr. 860.) And even "when I sleep, I still remember." (Tr. 861.) E.J. experiences atypical separation anxiety and worries that something could happen to her mother in E.J.'s absence. (Tr. 857, 861.) According to Dr. Goslin, E.J. also displays certain coping behaviors related to her trauma exposure. (Tr. 879.) Those include – based on Geraldine's reporting – sucking her fingers (beyond the normal age for doing so), a pattern of finding comfort in sweets following FaceTime visits with Guillaume, and, at an earlier age, pulling out her own hair. (Tr. 879-880.)

From the data she gathered, Dr. Goslin concluded that E.J. meets the DSM-5 criteria for PTSD and that there is no plausible alternative explanation for her particular symptoms. (Tr. 880-83.) Dr. Goslin considered but ruled out the possibility that either E.J. or Geraldine was malingering; that is, deliberately lying or exaggerating their symptoms.[68] (Tr. 887, 890-92, 1109.) She also considered and ruled out whether E.J.

---

[68] The Court does not equate the psychological experts' determinations about malingering with the Court's determination of witness credibility. Malingering specifically focuses on symptomology. The Court, as factfinder, makes the ultimate determination of witness credibility. Thus, even though crediting Dr. Goslin's and Dr. Cling's determinations that neither Geraldine nor E.J. were malingering for purposes of diagnosis, the Court does not rely on those determinations to assess the credibility of Geraldine's testimony as a trial witness. *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (experts may not opine on the credibility of other witnesses at trial); *Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011, at *24 n.19 (E.D.N.Y. Oct. 15, 2019) (stating in Hague Convention case that child's credibility is

was coached or, through overhearing her mother, adopted Geraldine's narrative of domestic violence. (Tr. 887-88, 890-92, 1129.) E.J. used language characteristic of a six-year-old, not adult language as she might have if coached. (Tr. 889-91.) As Dr. Goslin explained, "it is extremely unlikely that a six-year old would somehow know what to say in response to clinical interviewing questions and that simultaneously she would also be such a skilled actress to be able to fake … her facial expressions and body language." (Tr. 887, 891.) Additionally, Dr. Goslin considered whether E.J.'s removal from Morocco, move to the United States, and the pending divorce of her parents could be the cause of her PTSD symptoms, and determined they could not. (Tr. 892, 1129.) And, she considered but ruled out the possibility that the source of E.J.'s trauma is the unexpected two-year separation from her father. [69] (Tr. 977, 1060-61.)

For E.J. to recover from her PTSD, it is "vitally important" that E.J. feel both physically and emotionally safe and that significant trauma reminders be reduced or eliminated. (Tr. 895-96.) Based on what she has seen and reviewed, Dr. Goslin is of the opinion that E.J. would not feel safe if left in an unsupervised setting with her father as she would experience anxiety, anger, and other negative feelings. (Tr. 904-05.) Dr. Goslin's opinion in that regard was reinforced by the videos she watched of Guillaume's

ultimately a question for the court, not the psychological expert, to determine); *Haimdas v. Haimdas*, No. 09-CV-2034, 2010 WL 652823, at *3 (E.D.N.Y., Feb. 22, 2010) (rejecting expert opinion about credibility of child witness in Hague Convention case).

[69] The importance of the potential causes ruled out by Dr. Goslin cannot be over-emphasized. Child abductions "are traumatic for children and are considered by some child psychologists to be 'one of the worst forms of child abuse'; as a result of an abduction, the child may experience depression, PTSD, identity-formation issues, or other psychological problems, and may be prevented 'from forming a relationship with the left-behind parent.'" *In re Lozano*, 809 F. Supp.2d at 218 (quoting *Abbott*, 560 U.S. at 21).

FaceTime visits with E.J., where Guillaume dismissed her feelings, frustrated her, and denigrated her.[70]  (Tr. 897-903.)  To further support recovery, Dr. Goslin recommends that E.J. see a therapist.  (Tr. 906.)

According to Dr. Goslin, E.J. would not be able to recover from her PTSD if returned to Morocco.  (Tr. 907.)  It is "extremely likely" that E.J. would feel less safe if she were returned to Morocco even though Guillaume and Geraldine would not be living together.  (Tr. 897, 1117-18.)  Dr. Goslin predicts "with a great deal of certainty" that if returned to Morocco, whether with Geraldine or without her, E.J.'s PTSD symptoms would increase and her developmental functioning would regress.  (Tr. 908-11.)  The outcome would be even worse if E.J. were to be separated from Geraldine as Geraldine is her primary caregiver.  (Tr. 910.)

---

[70] Such behaviors included, for example, Guillaume's suggesting that he had better things to do than waiting for E.J. to speak to him, turning off the light, and leaving the room (R-281); playing with E.J.'s toys from Morocco that E.J. could not play with in New York (R-282); and telling E.J. that she was being mean (R-469).  (Tr. 1119-20.)  Even Dr. Favaro conceded that "there were things on those videos that Mr. Jacquety did that I thought weren't great parenting."  (Tr. 2326.)  The videos with those negative behaviors were only some of the hundreds of FaceTime visits that Guillaume has had with E.J. during the last two years.  Many videos depict positive interactions, particularly during earlier times.  As Dr. Goslin explained, however, the presence of positive interactions with a perpetrator of domestic violence does not negate the presence of symptoms of PTSD; children exposed to PTSD commonly have complex and conflicting feelings about the perpetrator of that violence that could include love and missing them.  (Tr. 893, 1086.)  Thus, the fact that there are videos depicting positive, happy, loving moments between Guillaume and E.J. does not detract from a diagnosis of PTSD resulting from exposure to domestic violence between Guillaume and Geraldine or the conclusion that E.J. would suffer serious psychological harm if she were returned to Morocco.  (Tr. 1130-32.)

Petitioner levels numerous criticisms of Dr. Goslin's opinions. Most of them are merely counsel's speculation unsupported by Dr. Favaro or any other source,[71] and none of them separately or together materially undermine the reliability of Dr. Goslin's opinions.[72] (*See* Pet. Mem. at 15-26.) "Most critically," according to Petitioner, Dr. Goslin repeatedly and mistakenly characterized E.J.'s use of the term "smack" as a physical act of violence. (Pet. Mem. at 17-18.) It is true that when Dr. Goslin asked E.J. for an example of when her father smacked her mother, E.J. described an incident in which she and Geraldine hid in another room because Guillaume was yelling and using bad

---

[71] For instance, Petitioner theorizes that "EJ's exposure to two years of Geraldine's angry denigration of Guillaume" and allegations discussed with her lawyers and Wadghiri "are a far more likely cause of EJ's very general references" (Pet. Mem. at 19), an argument that Dr. Goslin rejected (Tr. 1082-83). Petitioner asserts that E.J.'s hypervigilance and worry about her mother's safety "is an obvious result of being totally dependent on her mother in a strange new country" (Pet. Mem. at 21), even though neither Dr. Goslin nor Dr. Favaro offered any such opinion. To similar effect, Petitioner speculates, with no confirmation by any expert, that E.J.'s persistent anger toward her father "was likely encouraged by" Geraldine (Pet. Mem. at 22). As noted earlier, there is substantial evidence that Geraldine supported and encouraged E.J.'s relationship with her father.

[72] Several of Petitioner's criticisms are simply truisms that Dr. Goslin accounted for, or disagreement with what the record otherwise refutes. For example, Petitioner emphasizes the difference between clinical and forensic evaluations (Pet. Mem. at 15), but Dr. Goslin acknowledged that distinction and followed all ethical guidelines for forensic evaluation (Tr. 797-99). Petitioner accuses Dr. Goslin of ignoring Geraldine's motivation to lie (Pet. Mem. at 19-20, 23), even though Dr. Goslin repeatedly explained her consideration of that possibility (Tr. 887, 890-92, 1109). Petitioner faults Dr. Goslin for failing to provide the Court with information about "obvious alternate hypotheses" (Pet. Mem. at 26), even though Dr. Goslin expressly addressed several alternative hypotheses, none of which plausibly explain E.J.'s manifestation of PTSD (Tr. 880-83, 887-88, 890-92, 997-98, 1060-61, 1129). Petitioner accuses Dr. Goslin of merely having "rubber-stamped Geraldine's views" (Pet. Mem. at 24), even though Dr. Goslin considered other sources, including Guillaume's rendition of events provided to his lawyer and Dr. Favaro, many video recordings, and, most importantly, her interviews with E.J. (Tr. 816-17, 823-24). Petitioner faults Dr. Goslin for not seeking out additional sources of information (Pet. Mem. at 19-20), even though Dr. Goslin did so, albeit unsuccessfully (Tr. at 948-49).

language.  (Tr. 833-34; *see also* Tr. 1001-02 (E.J. describing "worst" incident as when both Geraldine and Guillaume were using bad words.)  It is also true, according to Dr. Goslin, that E.J. never described a specific incident of physical violence apart from repeated references to her father "smacking" her mother.  (Tr. 996-97.)  In Petitioner's view, "smack" refers only to use of bad words, as in "talking smack," and Dr. Goslin improperly capitalized on "EJ's misuse of a word."[73]  (Pet. Mem. at 20.)

As Petitioner would have it, Dr. Goslin's equating "smack" with physical violence demonstrates her "very strong bias."  (Pet. Mem. at 18.)  The Court disagrees.  Dr. Goslin explained that E.J. specifically used the term "smack" as a reference to physical violence.  (Tr. 996-97.)  Her notes reflect E.J. expressly feeling bad for Geraldine because "no one can **touch** her like that."  (R-299 at 6066 (emphasis added).)  And there is more.  When administering the Trauma History Questionnaire, Dr. Goslin asked E.J. whether she had "ever seen or heard people in [her] family **physically** fighting, attacking or beating each other up."  E.J. responded "yes," and when asked who did that, she replied it was her "dad."  (R-299 at 6074 (emphasis added); Tr. 988-89.)  In response to a question about peer bullying, E.J. reported that a girl had "smacked and pushed me at school," which Geraldine confirmed involved an incident where E.J. had been **slapped** by another child.  (R-299 at 6073-74; Tr. 979-80, 991.)

---

[73] "Talking smack" is the Court's phrasing; there is no evidence that E.J. ever used the phrase.  Cambridge Dictionary defines "talk smack" as "to make critical or insulting comments to someone, especially an opponent."  *Talk Smack*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/talk-smack (last visited May 10, 2021.)  There is a note of irony in Petitioner's claim to know what E.J. meant by her purported "misuse" of a word in her interviews with Dr. Goslin when Petitioner's mental health expert declined to conduct his own interview of E.J.

Ultimately, Dr. Goslin's conclusions are grounded in E.J.'s reality and do not depend on whether Geraldine's version of events is true or whether Guillaume's version of events is true. Accordingly, when asked by the Court if her conclusions would be any different if both Guillaume and Geraldine had been violent with each other, rather than only directed by Guillaume to Geraldine, Dr. Goslin testified they would not. That is because E.J.'s

> perception and experience is that it wasn't mutual. The things she is reporting are fears of harm to her mother. And so being returned to Morocco and … potentially in her father's care would lead to an increase in her PTSD symptoms and a decrease in her overall functioning even in the context of finding out that domestic violence was mutual.

(Tr. 1136.) And, even if the truth were that there had been no domestic violence at all, but E.J. presented as she has, Dr. Goslin still would conclude that E.J. would face grave risk of harm if returned to Morocco. As Dr. Goslin explained, "Unfortunately, her risk would be the same in the sense that her feelings of fear and lack of safety, lack of safety for her mother, that is her reality. So returning her … would pose those same risks of an increase in her symptoms and a decrease in her functioning overall." (Tr. 1137.)

### 2. Dr. Cling

Dr. Cling is a forensic and clinical psychologist; she also has a law degree. (Tr. 1383.) She teaches courses in psychology and sexualized violence at the John Jay College School of Criminal Justice and at Teachers College at Columbia University. (Tr. 1387-88.) The Court accepted Dr. Cling as an expert in psychological evaluation, forensic psychology, psychological aspects of domestic violence, and legal issues related to domestic violence. (Tr. 1391-92.) Based on her evaluation, Dr. Cling opined with a "very high" degree of confidence that Geraldine suffers from PTSD as a result of domestic

violence inflicted by Guillaume,[74] and that her PTSD symptoms would "dramatically increase" if she returned to Morocco where she believed herself to be unsafe.[75] (Tr. 1481-83.)

Dr. Cling also explained the dynamics of domestic violence and typical characteristics of abusers and victims. (Tr. 1392-96.) Domestic violence centers on the abuser's exercise of power and control over the victim, which can include financial dominance, psychological abuse, occasional physical violence, and constant denigration. (Tr. 1392-96.) Just as Guillaume refused to acknowledge his own faults and constantly blamed Geraldine for his own outbursts and behavior, abusers tend to "externalize blame"; they are "never at fault, and the victim is always to blame." (R-448-1 at 007; Tr. 1395-97, 1450-53.) Additionally, perpetrators of domestic violence also commonly exhibit as "Dr. Jekyll and Mr. Hyde," as Geraldine described Guillaume, where they are generous and charming at one moment, and then become irritated and explosively "lose it" in a fit of violence. (Tr. 1402-04.) Such relationships are not all or nothing; rather, they are a mix of good times and very bad times. (Tr. 1404.) Neither Guillaume's generosity nor Geraldine's expressions of love for Guillaume or not wanting to divorce are surprising or inconsistent with domestic violence. (Tr. 1402-04, 1447-48.)

---

[74] On a scale of one to ten, Dr. Cling's confidence is a nine; she did not give a ten because she never gives a ten. (Tr. 1481-82.)

[75] Dr. Cling does not know if there are *no* circumstances at all under which Geraldine could return to Morocco and not suffer PTSD, but she thinks it is "probably true" that there are none because she cannot think of such circumstances. (Tr. 1558.) Even if Guillaume adhered to an order of protection in Morocco and Geraldine lived in a different city than Guillaume within Morocco, Geraldine's PTSD would still be worse as being there would trigger her symptoms. (Tr. 1561.) Petitioner faults Dr. Cling for "guessing," but Dr. Cling characterized her answer that way because counsel had asked her hypothetically. (Tr. 1560-61.) In any event, the focus of the grave risk inquiry is E.J., not Geraldine.

Like Dr. Goslin, Dr. Cling employed a reliable and generally accepted methodology to evaluate Geraldine. Specifically, Dr. Cling administered the Clinician Administered PTSD Scale for DSM-5 ("CAPS"), a structured interview considered to be the "gold standard" in PTSD assessment. (R-448-1 at 012-14; Tr. 1549; *see also* Tr. 1414-15.) Dr. Cling interviewed Geraldine over three sessions. (Tr. 1411.) The CAPS assessment showed that Geraldine's levels of PTSD "were markedly elevated and severe." (R-448-1 at 013; Tr. 1415.) Moreover, symptoms endorsed by Geraldine included ones specific to Guillaume, such as intrusive memories about the way Guillaume looked at her and about the incident surrounding Tom the dog; nightmares of Guillaume holding a knife; and flashbacks of Guillaume using cocaine, and of cooking paella that Guillaume dismissed as "shit" while throwing away the plate. (Tr. 1433-36.)

Also like Dr. Goslin, Dr. Cling considered whether, and rejected the hypothesis that, Geraldine was malingering by faking or lying about her symptoms supporting Dr. Cling's PTSD diagnosis. (Tr. 1466-68, 1495-96.) Dr. Cling determined that Geraldine was not malingering because there was no basis to believe that Geraldine would have both known the many symptoms necessary to support a PTSD diagnosis and also possess the acting ability necessary to convincingly mimic those symptoms and deceive a trained forensic psychologist like Dr. Cling.[76] (Tr. 1467-68.) Moreover, sources other

---

[76] Dr. Cling's rationale for concluding that Geraldine was not malingering was rather thin. Prior to her interviews and evaluation by Dr. Cling, Geraldine had received information about trauma symptoms. Indeed, Darwin Rodriguez's notes of his treatment sessions with Geraldine reflect that he provided "psychoeducation about the signs and symptoms of trauma." (*E.g.*, R-64 at 4044.) Moreover, Dr. Favaro presented data about the difficulties even trained psychologies have in correctly identifying malingering. (Tr. 2304-05, 2317.) That said, there is no record evidence that Geraldine was in fact malingering in her interviews with Dr. Cling.

than Geraldine confirmed Dr. Cling's diagnosis. Those included the session notes and interview of Darwin Rodriquez, who treated Geraldine for over a year and a half and observed the same symptoms reported by Dr. Cling (R-064; Tr. 1453-55, 1458-63); E.J.'s reporting of Guillaume's violence and abusive behaviors to Dr. Goslin (Tr. 1463-66, 1481); and the cross-examination of Wadghiri, which underscored Geraldine's PTSD symptoms (R. 1468-77).[77]

Petitioner charges that Dr. Cling's opinion was compromised by "selective attention bias (noticing things that are salient to us and disregarding the rest) followed by confirmation bias (looking for things that support our hypotheses while disregarding potential counter-evidence)." (Pet. Mem. at 26-31.) The Court disagrees. Dr. Cling well-defended her methodology on both direct and cross-examination, and, to a large extent, Petitioner's critique turns on mischaracterization, inaccuracies, and issues of little to no consequence.[78] First, several of Petitioner's assertions mischaracterize what Dr. Cling actually did or attribute assumptions to her that she did not make. (See, e.g., Pet. Mem. at 27-28 ("Dr. Cling had a hypothesis and a goal before she ever met Geraldine"; Dr. Cling

---

[77] For example, Wadghiri testified to Geraldine being "paranoid," in "constant fear" and "constant anxiety," accusing Wadghiri of "not doing enough," and of being drunk when he in fact was not. (Tr. 1469-72, 1475.) And, Geraldine reported to Dr. Cling that she, Geraldine, could be aggressive and lose her temper with Wadghiri. (Tr. 1444.) As Dr. Cling explained, such behavior is symptomatic of Geraldine's PTSD and "completely consistent" with Dr. Cling's diagnosis. (Tr. 1445, 1471, 1476.) Domestic violence victims like Geraldine often project onto future relationships the experience they have had in the abusive relationship from which they have escaped. (Tr. 1472-73.)

[78] Petitioner's attempts to portray Dr. Cling as a hired-gun were similarly unavailing. Dr. Cling has declined to serve as an expert in cases where her evaluation did not find PTSD (Tr. 1419); she has never previously been hired by Respondent Geraldine's counsel and only tangentially worked with them once before (Tr. 1485); she has not previously appeared as an expert witness in the same case as Dr. Goslin (Tr. 1486); and her forensic work is only about five to ten percent of her overall work (Tr. 1486).

operated on "the false assumption that people who behave similarly must be doing so for the same reason"; Dr. Cling's methodology "revolves around … the unproven assumption that all patients behave the same way").)

Second, Petitioner inaccurately describes Dr. Cling as making mistakes that she did not make. Petitioner thus accuses Dr. Cling of "mistakenly" describing Mr. Rodriguez's notes of his interviews with Geraldine as being "contemporaneous" (Pet. Mem. at 29) even though Dr. Cling expressly acknowledged that the notes were made after Geraldine's arrival in New York and thus were contemporaneous as to Mr. Rodriguez's meetings with Geraldine, not as to the events Geraldine reported to him (Tr. 1462-63).

Third, Petitioner accuses Dr. Cling of ignoring or failing to heed facts that she did not ignore. Petitioner thus faults Dr. Cling for failing to heed the doubts of a therapist – Dr. Christine Gerard – whom Geraldine had consulted after her arrival in New York as potential help for E.J. but whom Geraldine could not afford to retain.[79] (Pet. Mem. at 29.) Dr. Cling did not disregard what Dr. Gerard told her. To the contrary, Dr. Cling specifically sought out information from Dr. Gerard "because I was starting out in the case and wanted information." (Tr. 1503.)

Fourth, Petitioner picks battles that are not material. For instance, Petitioner accuses Dr. Cling of ignoring various motives that Geraldine may have had for lying. (Pet.

---

[79] Petitioner's characterization of Dr. Cling's notes about what Dr. Gerard told her is misleading. The notes first indicate that Dr. Gerard found Geraldine's story to be "credible" (and Geraldine naive for marrying Guillaume); then a few lines later that Dr. Gerard "had some doubts" about what "sounded like an incredible story"; and then just a few more lines later that Dr. Gerard thought the story was "credible" even if very unusual. (P-100 at 001-02; Tr. 1501-03.)

Mem. at 28.)  Yet Dr. Cling specifically considered whether Geraldine was lying or otherwise malingering, regardless of motive.  (Tr. 1466-68, 1495-96, 1523-25, 1527-29.)  Also of little significance, Petitioner faults Dr. Cling for not administering a test known as the MMPI to assess whether Geraldine was malingering, even though Petitioner's questioning acknowledged that the MMPI is only "sometimes" used for that purpose.  (Pet. Mem. at 28; Tr. 1467.)  And Dr. Favaro tentatively testified that the MMPI "***can*** contribute to the tool set" and "***could*** have been useful," but did not say that Dr. Cling's decision not to use it nullified her methodology or her conclusions.[80]  (Tr. 2316-17 (emphases added).)

More broadly, Petitioner contends that Dr. Cling relied on nothing more than "self report" sources for which the underlying information was provided by Geraldine, and calls that a "critical weakness" in her evaluation.  (Pet. Mem. at 30.)  Thus, Dr. Cling relied on what Geraldine said and did during her interviews with, and evaluation by, Dr. Cling. Likewise, while Dr. Cling pointed to the year and a half of session notes authored by Darwin Rodriguez in his treatment of Geraldine as further confirmation of her opinions, those session notes are all based on what Geraldine told and exhibited to Mr. Rodriquez. In contrast, as Petitioner notes, there are no medical records of physical injuries to Geraldine, no photographs of such injuries, no police reports of complaints lodged by Geraldine; and, Dr. Cling did not ask why that is.  (Pet. Mem. at 27.)

---

[80] Dr. Cling acknowledged that the MMPI can be used to assess truthfulness and faking of symptoms, but she decided that it would not make sense to do so here because Geraldine is not a native English speaker, and the specific meaning of words in the test matter.  (Tr. 1467.)  As Dr. Favaro noted, the MMPI is available in French, not just English. (Tr. 2316.)  Petitioner's counsel did not ask Dr. Cling whether she considered using a French version of the test.

Petitioner overlooks, however, that Dr. Cling's opinion also took into account a variety of sources, not merely those which Petitioner characterizes as self-reported by Geraldine. In forming her opinion, Dr. Cling also considered Dr. Favaro's initial report and exhibits, which included Guillaume's own self-reported emails to Dr. Favaro, some of Guillaume's social media postings, videos of FaceTime visits between Guillaume and E.J., and other materials. (Tr. 1514-15, 1564.) In any event, Petitioner's criticism misses the point of Dr. Cling's expert role. Dr. Cling evaluated Geraldine's psychological symptomology and assessed whether Geraldine was malingering; to do that, she implemented the CAPS structured interview methodology, which Dr. Favaro agreed has "pretty good validity and reliability" (Tr. 2322), and did not need to conduct a factual investigation of what particular incidents of domestic violence did or did not occur. That said, Dr. Cling conceded that the only factual evidence of domestic abuse of which she was aware are Geraldine's rendition of events (and as she reported to others) and the video in which Guillaume violently slapped the phone out of Geraldine's hand. (Tr. 1519.) But that does not render unreliable Dr. Cling's evaluation and opinions of Geraldine. As the Court already has acknowledged, much of the evidence in this case is of the "she-said, he-said" variety, which is for the Court, as fact-finder, to assess.

### 3. Dr. Favaro

Dr. Favaro describes his expertise as "psychology within court related matters," including with the research methodologies underlying psychological evaluations in court settings and in domestic violence. (P-88 at 1027-28.) Dr. Favaro did not evaluate or offer any opinion about E.J. Rather, his testimony at trial focused on elucidating shortcomings in Dr. Goslin's and Dr. Cling's opinions. In particular, he faulted them for not setting forth

in their reports consideration of alternative hypotheses and limitations of the methodologies they used. (*E.g.*, Tr. 2299, 2312, 2332-34, 2341.) According to Dr. Favaro, Dr. Goslin's and Dr. Cling's testimony did not "fulfill what I would consider to be a high enough standard for forensic testimony." (Tr. 2299.)

In the course of his testimony, however, Dr. Favaro actually bolstered significant aspects of Dr. Goslin's and Dr. Cling's testimony. He thus recognized the central dynamic of domestic abuse can be "coercive control," which may include not only violence, but also psychological, emotional, and financial control. (Tr. 2344.) He agreed that by the time a relationship becomes physical in any way – with even just a single push, shove, or slap – the lives of the participants are in jeopardy. (Tr. 2362-64.) He confirmed the reliability and validity of the diagnostic tools employed by Dr. Goslin and Dr. Cling. (Tr. 2322.) He also characterized Dr. Goslin's work, clinically, as "great" and "very, very appropriate work," even though, from his vantage point, the scientific validity of her report was "unknown." (Tr. 2299, 2338.)

As for his criticisms, the Court has already found that Dr. Goslin and Dr. Cling did consider alternative hypotheses, and each set forth their analysis of whether Geraldine and / or E.J. were malingering. The Court agrees with Dr. Favaro that it would have been preferable from the Court's vantage point for both Dr. Goslin and Dr. Cling to have set forth additional discussion of alternatives in their reports, but the Court does not find that the failure to do so undermines their reliability, particularly given that they testified and rejected alternatives during direct and cross-examination.[81] Similarly, while the Court

---

[81] Dr. Favaro conceded he has no idea whether there is a factual basis for any of the alternative hypotheses he posited. (Tr. 2369.)

agrees with Dr. Favaro that experts appearing before the Court should be forthcoming with respect to any significant limitations of their methodologies, the Court finds that neither Dr. Goslin nor Dr. Cling sought to mask any limitations. The Court also finds that the limitations discussed by Dr. Favaro, and addressed by Dr. Goslin and Dr. Cling at trial, do not render their opinions unreliable.

The Court recognizes that the methodologies used by Dr. Goslin and Dr. Cling are not perfect. (Tr. 2322.) The Court also recognizes that the data and information on which Dr. Goslin and Dr. Cling based their opinions are limited. And, the Court recognizes that neither Dr. Goslin nor Dr. Cling used every tool at their disposal.[82] But their methods, findings, and conclusions are more than sufficient for the Court to rely on.[83]

More telling than Dr. Favaro's criticisms are what Dr. Favaro did not do and did not opine about. Most significantly, he abandoned his own plan to interview E.J. During expert discovery, and in advance of interviewing E.J. for his rebuttal report, Dr. Favaro sought to have Geraldine, on relatively short notice, complete three questionnaires

---

[82] Particularly in regard to malingering, Dr. Favaro testified about instruments that Dr. Goslin and Dr. Cling could have used, but did not, to objectively test for malingering. (Tr. 2320-22.)

[83] It is interesting to note that although Dr. Favaro did not conduct his own forensic evaluation of either Geraldine or E.J., he can be faulted for the same criticisms he leveled against Dr. Goslin and Dr. Cling. For instance, Dr. Favaro did not record his interviews with Guillaume as it is his general practice not to record interviews with adults (Tr. 2354-55), and he relied on Guillaume's self-reported version of events (Tr. 2353, 2356-57). Moreover, if anyone betrayed a bias of sorts, it was Dr. Favaro, in characterizing Geraldine as Guillaume's "wicked ex." (R-244 at 273.) Dr. Favaro's explanation that he used that terminology to reflect back what Guillaume was describing to him was less than satisfactory. (Tr. 2375.) Rather, Dr. Favaro used the term in an email he sent to Guillaume and Guillaume's counsel regarding "a few things we need to strategize around" in response to Guillaume's suspicions that Geraldine was manipulating E.J. into distancing herself from Guillaume. (R-244 at 272-73.)

containing over 450 questions, many of which called for narrative responses. The Court found that request oppressive, particularly as many of the questions had nothing to do with the issues in this proceeding. (*See* Dkt. 100 ¶ 4; Tr. 2348.) Rather than pare down the questions as the Court directed, Dr. Favaro decided not to evaluate E.J. or to have Geraldine answer any questions. (Tr. 2335, 2337.) Although Dr. Favaro offered several reasons why he did not follow through on interviewing E.J, none were persuasive.[84]

Not having interviewed or evaluated E.J., Dr. Favaro was left with nothing to rebut the opinions of Dr. Goslin and Dr. Cling. He thus does not know whether there was domestic violence in this case. (Tr. 2374.) He "ha[s] no idea whether or not [E.J.] has PTSD." (Tr. 2341.) Nor could he offer any opinion whether E.J. is at grave risk of harm if she returned to Morocco because he "did not perform that kind of evaluation." (P-88 at 9; Tr. 2374; *see also* Tr. 2342 (admitting he did not evaluate E.J. for whether or not she would be subject to potential harm or grave risk).) Nonetheless, he conceded, as he was compelled to do given his testimony elsewhere, that "a child who witnesses coercive

---

[84] Dr. Favaro's professed reasons for not interviewing E.J. were that he thought the pre-interview questionnaires to Geraldine would be subject to confounding variables both because attorneys had seen the questionnaires and because the questionnaires would have had questions removed; the controversy itself may have influenced Geraldine's response style; the timing became problematic; and he grew concerned about the potential emotional toll on E.J. from having to participate in an additional set of interviews. (Tr. 2335-38.) None of these reasons separately or together strike the Court as credible bases not to have interviewed E.J., which Dr. Favaro could have accomplished well in advance of trial and even before his initial report submitted on June 2, 2020. (Tr. 2345.) Certainly, his efforts were not "thwarted." (P-88 at 9.) Respondents contend that "[t]he only reasonable conclusion is that [Dr. Favaro] decided not to interview or assess E.J. to avoid hearing the same report of [Guillaume]'s violence that she made to Dr. Goslin." (Resp. Mem. at 30.) While possible, that explanation does not seem to account for the fact that Dr. Favaro need not have made any overtures at all to interview E.J. following his review of Dr. Goslin's report. In any event, the salient fact is that Dr. Favaro did not interview or evaluate E.J. and therefore did not and could not offer an opinion of her condition or her prospects.

control or lives in a coercively controlling environment receives the same type of emotional trauma as a child who is directly abused." (Tr. 2343.) *See Grano v. Martin*, 443 F. Supp.3d 510, 532 (S.D.N.Y. 2020), *aff'd*, 821 F. App'x 26 (2d Cir. 2020).

## L. Moroccan Law Expert Opinions

Each side submitted an expert report addressing Moroccan law. Both experts focus on the extent to which Moroccan laws protect victims of domestic abuse. The Court finds neither report to be particularly salient to the issues to be resolved.

### 1. Dr. Feather

Respondents' expert report comes from Ginger R. Feather, Ph.D. (R-450-1.) For the last ten years, Dr. Feather has conducted research on legal discrimination and resulting violence against women in Morocco and Tunisia. (R-450-1 at 001.) In sum and substance, Dr. Feather opines that Morocco has an "extreme" level of domestic violence, including physical, psychological, and economic violence; the laws of Morocco are deficient in protecting victims of domestic violence; and "the laws in Morocco, as implemented and in practice, simply do not afford [Geraldine] and [E.J.] any real protection from continued domestic abuse." (R-450-1 at 009, 013.) The Court credits Dr. Feather's reporting of statistics and observations about the general experience of victims of domestic violence in Morocco but not her explanation of Moroccan law as she does not appear to have any training in Moroccan law.

### 2. Attorney Achibane

Petitioner submitted two expert reports offering opinions from Mustapha Achibane, a Moroccan attorney with experience in handling divorce and child custody cases in Morocco, including cases involving domestic violence. (P-45; P-74.) Mr. Achibane

describes and vouches for Moroccan legal protections for victims of domestic violence, although he does nothing to rebut Dr. Feather's analysis and description of the actual experience of domestic violence victims in Morocco. Among other additional opinions, he also explains that Guillaume and Geraldine's marital status is not governed by Morocco's Shariah-based Family Code, but instead by French law. (P-74 at 003.)

## Conclusions Of Law

### A.     Grave Risk Of Harm

Respondent has proven by clear and convincing evidence that E.J. faces a grave risk of harm if she is repatriated to Morocco. Dr. Goslin determined that there is "clear and compelling evidence" that E.J. suffers from PTSD resulting from domestic violence by Guillaume toward Geraldine, and that E.J. is at serious risk of an increase in her PTSD symptoms and negative impact on her development if she were to return to Morocco. (Tr. 779, 851, 1135.) Dr. Goslin predicted "with a great deal of certainty" that if returned to Morocco, E.J.'s PTSD symptoms would increase and her developmental functioning would regress. (Tr. 908-11.) In short, E.J. would not be able to recover from her PTSD if returned to Morocco. (Tr. 907.)

E.J.'s plight has been made even more precarious as a result of the recent Moroccan Judgment awarding physical and residential custody of E.J. to Guillaume based on a one-sided record. Dr. Goslin testified that if left in an unsupervised setting with her father, E.J.'s PTSD symptoms would intensify and she therefore would neither feel safe nor be safe.[85] (Tr. 904-05.) Making matters worse, the Moroccan Judgment

---

[85] Dr. Goslin did not testify, and the Court does not find, that E.J. would be unsafe due to physical mistreatment of E.J. by Guillaume.

imposes extreme restrictions on Geraldine's visitation rights, limiting her to only day time visits on the weekends. As a result, E.J. will be deprived of her primary caregiver, further exacerbating her PTSD. (*See* Tr. 910.)

Dr. Goslin based her opinions on data derived directly from E.J. through multiple evaluations. She is the only expert who evaluated E.J. Petitioner provided no expert testimony to rebut Dr. Goslin's. To the contrary, Dr. Favaro conceded that he had no opinion whether or not E.J. was suffering from PTSD, and no opinion whether E.J. would face grave risk of harm upon return to Morocco. (Tr. 2341-42, 2374.) Courts have denied petitions under the Convention in such circumstances.

For instance, in *Blondin IV*, the Second Circuit affirmed the denial of a petition to return two children to France. The district court found that petitioner had beaten his wife, the respondent, often in the child's presence and that he had also beaten one of the children. The district court also accepted the expert testimony of an expert child psychiatrist, Dr. Solnit. Like Dr. Goslin here, Dr. Solnit opined that the children were recovering from PTSD and that "if the children were returned to France with or without their mother and even if they could avoid being in the same domicile as the father … they would almost certainly suffer a recurrence of their [PTSD] that would impair their physical, emotional, intellectual and social development." 238 F.3d at 160. The petitioner in *Blondin IV* did not provide any contrary expert testimony to rebut Dr. Solnit's opinions.

That was pivotal. As the Court explained with words that apply just as well to the instant case:

> Blondin did not present any evidence as to the psychological impact that a return to France would have on the children. We are thus presented with a rare situation in which, for unexplained reasons, no evidence was presented by one

> party that would contradict the conclusions of an expert
> procured by the opposing party. Dr. Solnit's conclusions thus
> stand uncontroverted. They are the only evidence that we and
> the District Court have available as to whether repatriation to
> France would cause the children to suffer a recurrence of
> traumatic stress disorder.

*Id.* Explaining further the import of the expert's uncontroverted opinion, the Court underscored the significance of a PTSD diagnosis to the grave-risk determination: "A grave risk of psychological harm, even construed narrowly, undoubtedly encompasses an almost certain recurrence of traumatic stress disorder." *Id.* at 163 (internal quotation marks and brackets omitted); *see also Davies*, 717 F. App'x at 49 n.4 (recognizing that in *Blondin IV*, the Court held on de novo review that "almost certain recurrence of post-traumatic stress disorder in children satisfied Article 13(b)'s grave-risk requirement.")

Sixteen years later, the Second Circuit in *Davies* reached a similar conclusion in affirming the district court's denial of a petition to return a child to French St. Martin. There, the court found that the respondent had endured years of psychological abuse and increasingly violent behavior from petitioner, much of which occurred in the presence of the child and some of which was directed at the child. 777 F. App'x at 46-48. The Court of Appeals acknowledged that the abuse was "primarily psychological in nature" and that "the district court based its legal conclusions under the Convention principally on the risk of psychological harm to [the child]." *Id.* at 47. Indeed, the district court relied on expert testimony similar to that tendered by Dr. Goslin: that returning the child to a place where the abuse occurred and to the care of the person who had abused the mother would set off a "tremendous traumatic reaction" in the child, increasing his symptoms and harming "his developmental trajectory"; that her opinion would not change if the child resided part-time with petitioner upon his return, and that her opinion would be the same

even if the child did not reside with petitioner at all.[86]  *Davies v. Davies*, No. 16-CV-6542, 2017 WL 361556, at *17 (S.D.N.Y. Jan. 25, 2017).

In some respects, the corroborating evidence and extent and magnitude of abuse in *Blondin IV* and *Davies* exceed those existing here.  But the Court refers to *Blondin IV* and *Davies* not for a comparison of the level of abuse, but rather because of the import the Court placed on the uncontroverted expert testimony about the child's PTSD.  *See also Elyashiv*, 353 F. Supp.2d at 408-09 (denying repatriation where there was uncontroverted expert testimony that the children would suffer relapse of their PTSD symptoms upon returning to Israel, even if they had no contact with petitioner); *Reyes Olguin v. Cruz Santana*, No. 03-CV-6299, 2005 WL 67094, at *2-4, 7, 11-12 (E.D.N.Y. Jan. 13, 2005) (denying repatriation where there was uncontroverted expert testimony that return to Mexico would exacerbate child's PTSD).

Meanwhile, cases in which in which the court rejected the grave-risk defense either lacked expert testimony about the child's condition, or included contrary opinions from the petitioner's expert.  Making that exact distinction, the court in *In re Lozano* observed that "courts that determined that the [grave-risk] exception applied have done so when presented with uncontroverted expert testimony and other credible evidence that the child would face grave risk if returned."  809 F. Supp.2d at 224-26 (rejecting grave-risk defense where respondent's expert evaluation was controverted by petitioner's expert who also

---

[86] In *Davies*, the expert interviewed and evaluated only the respondent, not the child. 2017 WL 361556 at *16.  The court found the expert's testimony reliable in part because the expert's opinion was based in part on the history of domestic violence provided by respondent, whom the court found credible.  *Id.*  Here, Dr. Goslin's opinions are based primarily on her interviews and evaluation of E.J. using methods that the Court has deemed reliable.

evaluated respondent and the child and testified that repatriating the child to United Kingdom would not put the child at a grave risk of harm);[87] *see also Grano*, 443 F. Supp.3d at 543 (granting petition for repatriation to Spain where harm to respondent was mostly psychological but respondent did not present any expert evidence of psychological harm to the child);[88] *In re Filipczak*, 838 F. Supp.2d 174, 181 (S.D.N.Y. 2011) (granting petition for repatriation to Poland, quoting *In re Lozano*, and noting that no expert testimony had been presented), *aff'd*, 513 F. App'x 16 (2d Cir. 2013). Of course, petitions also have been granted for other reasons, regardless of the absence of expert testimony, such as where the evidence of grave risk to the child is lacking. *See e.g.*, *Lachhman v. Lachhman*, No. 08-CV-4363, 2008 WL 5054198, at *1, 9 (E.D.N.Y. Nov. 21, 2008) (granting petition where only evidence of abuse was fact that petitioner had, in the past,

---

[87] In *In re Lozano*, respondent's expert not only faced opposing testimony by petitioner's expert, but, in addition, respondent's expert could not say definitively that the child's trauma was caused by domestic violence as opposed to other causes, such as not only having been uprooted from her home in the U.K., but also having lived for seven months in a shelter. 809 F. Supp. at 212, 224. Here, in contrast, Dr. Goslin definitively attributed E.J.'s PTSD specifically to domestic violence, ruling out other potential causes. (Tr. 851, 887-92, 1129.)

[88] The *Grano* court also found that the petitioner had inflicted only psychological harm on the respondent, and credited only one instance of physical violence in which the petitioner slapped and grabbed the respondent's arm. The court found that evidence insufficient to find a grave risk of harm because respondent "failed to identify a single case in which a petitioner's psychological abuse of a respondent was, on its own, enough to establish that their child was at grave risk of future physical or psychological harm. Instead, nearly every case [respondent] cites that found that the child faced a grave risk included evidence that the respondent – or even the child – was physically abused, and usually severely so." 443 F. Supp.3d at 543.

been arrested, but not convicted, for domestic violence, and the respondent did not testify or even submit an affidavit).

Petitioner places substantial weight on the Second Circuit's decision in *Souratgar* in which the Court affirmed grant of a petition to return the child to Singapore. But *Souratgar* actually supports denying the Petition in this case. In its opinion, the Court emphasized that neither party had requested a psychological evaluation of the child, and that the child indicated that he "never saw or heard either parent hit the other or try to hurt the other parent." 720 F.3d at 104. The Court observed that "there [was] nothing in the record beyond speculation that [the child] would suffer unavoidable psychological harm if returned to Singapore." *Id.* Here, in contrast, E.J. was evaluated by Dr. Goslin; Petitioner's expert abandoned his plan to evaluate the child; and as reported by Dr. Goslin and reflected in her notes, E.J. witnessed her father hit her mother. In *Souratgar*, the Court distinguished appellate cases affirming denial of repatriation where "the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Id.* at 105. While the first two examples are not present here, the third is. Moreover, the Court qualified the extent of its holding:

> Our holding today is not that abuse of the kind described by [respondent] can never entitle a respondent to an Article 13(b) defense; rather it depends on the district court's finding that [the child] would not be in danger of being exposed to a grave risk of physical or psychological harm and that the Singapore court system has demonstrated its ability to adjudicate the dispute over his custody.

*Id.* at 106. Here, the Court makes a contrary finding.

To be sure, many of the cases in which petitions were denied based on grave risk of harm involved facts distinguishable from those present here. In some cases, there was more corroborative evidence of domestic physical violence than here. *See, e.g., Davies*,

717 F. App'x at 47 (corroboration provided by video and by non-party witness of petitioner's abusive conduct toward respondent). In some cases, the petitioner's abuse inflicted more serious injury on the respondent. *See, e.g.*, *Mohácsi*, 346 F. Supp.3d at 301-02 (petitioner secretly made sex tapes of mother and threatened to show them to their child, threatened to kill respondent, physically assaulted her on multiple occasions, and nearly choked her to death). In some cases, the abuse was directed not only against the mother but also directly against the child. *See, e.g.*, *Ermini*, 758 F.3d at 164-65 (affirming denial of petition for repatriation to Italy given petitioner's history of domestic violence towards respondent and his being "in the habit of striking the children"); *Davies*, 717 F. App'x at 46 (petitioner's "uncontrollable anger and abusive behavior was often directed at [the child]").

Notwithstanding those differences, this Court has found by clear and convincing evidence – based on Dr. Goslin's opinion, Dr. Cling's opinion regarding Geraldine, and the parties' testimony to the extent deemed credible – that E.J. experiences PTSD due to domestic violence, that returning her to Morocco will exacerbate her PTSD, and that she faces grave risk of harm if returned to Morocco. Those findings are supported all the more by E.J. herself in what she reported to Dr. Goslin, including that her dad "smacked" her mother many times, used bad language, yelled, was verbally abusive, and broke things in the home; that incidents of that nature happened a lot; that "[her father] kept smacking [her mother]" even though "she never does something"; that E.J. felt "bad" and worried for her mother's safety, "because she's my mom and no one can touch her like that"; that she "didn't trust [her] dad at all"; and that she "was afraid [her dad] would smack [her] mom again." (R-499-1 at 006, 010; Tr. 833-34, 839-42, 847, 961, 988-90, 995-96,

1001.)  And although E.J. has tried to stop thinking of the violence, "like 100 times," "it didn't work" and she "tr[ies] to forget all day long but it always comes back."  (R-449-1 at 010.)  In short, E.J. was exposed to sustained and serious violence that continues to haunt her.

**B.      Ameliorative Measures**

Even where there is a grave risk of harm from repatriation, the Court must consider whether there are "any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with [the] child's repatriation."  *Blondin II*, 189 F.3d at 248. Consideration of whether there may be remedies or conditions that will protect against grave risk of harm to the child is necessary to advance the principle of comity that undergirds the Convention.  *See id.* (explaining that deference to the forum of the child's home state "is necessary to preserve the spirit of mutual confidence which is the Convention's inspiration" (internal quotation marks and brackets omitted)).  The Court has considered means of mitigating E.J.'s grave risk of harm upon repatriation and finds that there are no ameliorative measures sufficient to prevent exacerbation of E.J.'s PTSD. The Court will address separately those remedies and measures that may be available from E.J.'s home state of Morocco, and those that may be obtained through measures undertaken by Petitioner.

## 1. Moroccan Legal System And Protections

Petitioner has offered expert testimony from Mr. Achibane that Morocco has laws to protect persons who are abused.[89]   Respondent has offered expert testimony explaining that despite having laws on the books, domestic violence remains prevalent and women remain unprotected.   The extent to which those propositions are true need not be resolved here.   As the Second Circuit has recognized, even when a country's authorities "are both willing and able to make numerous arrangements and accommodations to facilitate repatriation," there may be circumstances where they still "cannot provide the necessary protection."   *Blondin IV*, 238 F.3d at 162.   The instant case presents just such circumstances because to provide the necessary protection, Moroccan authorities "would [be] require[d] … to fulfill the impossible task of ensuring that a return to [Morocco] would not trigger a recurrence of traumatic stress disorder in the children."   *Id*.

In *Blondin II*, the Second Circuit remanded the district court's initial decision finding a grave risk of harm specifically for the purpose of evaluating potential ameliorative measures.   On remand, the district court found that there were no arrangements at all that would mitigate the grave risk of harm posed to the children, "because returning to

---

[89] Petitioner contends that Geraldine's coming to the U.S. was mere forum-shopping for a favorable venue to obtain custody, which the Convention was designed to prevent.  The record hints at that possible motive.  For example, Dr. Cling's notes of her discussion with the child psychiatrist whom Geraldine consulted with early after her arrival in New York indicate that Geraldine came to the U.S. mistakenly believing that the U.S. was not a member of the Convention.  (Tr. 1496-98; R-301.)  But based on the record as a whole, the Court finds that Geraldine did not abscond with E.J. for the purpose of finding a more favorable forum for determining custody, but rather to find safety from Guillaume.  She considered either Canada or the U.S. at the suggestion of her Portuguese lawyer, and she fled to the U.S. because that is where Wadghiri could shelter her and E.J.

France under **any** circumstances would cause them psychological harm, as France was the scene of their trauma. The court based this determination on uncontested expert testimony that the children would suffer from post-traumatic stress disorder upon repatriation." *Blondin IV*, 238 F.3d at 157 (emphasis added) (citation omitted); *see also Souratgar*, 720 F.3d at 104 (explaining that "[t]he holding in *Blondin IV* depended on the fact that due to the nature of the potential harm at issue – recurrence of PTSD that would occur as soon as the children entered France – there was nothing the courts could do to prevent it").

The situation here is the same. To reiterate, Dr. Goslin opined, "with a great deal of certainty," that if returned to Morocco, whether with Geraldine or without her, E.J.'s PTSD symptoms would increase, her developmental functioning would regress, and she would not be able to recover from her PTSD. (Tr. 907-11.) The Court credited that testimony. Just as in *Blondin* and *Davies*, regardless of what laws or services may be available in Morocco, E.J. would be subject to grave risk of psychological harm.

The recent Moroccan Judgment only underscores the point. Based solely on evidence presented by Guillaume, if returned to Morocco, E.J. will fall under his physical and residential custody, which is the worst scenario posited by Dr. Goslin. (*See* Tr. 904-05 (E.J. would neither feel nor be safe if left in an unsupervised setting with her father).) Even worse, the Moroccan Judgment deprives E.J. of her primary caregiver, severely limiting Geraldine to daytime visitation on weekends. Under those circumstances, E.J.'s PTSD will be all the more susceptible to exacerbation, and so will Geraldine's. (*See* Tr. 857, 861 (E.J. experiences atypical separation anxiety and worries that something could happen to her mother in E.J.'s absence); Tr. 1481-83 (Geraldine's PTSD symptoms would

"dramatically increase" in Morocco).)  Although Geraldine's PTSD is not the focus of the grave risk inquiry, it is relevant here to the extent that exacerbation of her PTSD will exacerbate E.J.'s.

## 2.  Undertakings by Petitioner

In his post-trial reply brief, Petitioner requests for the first time that he be given the opportunity to propose undertakings he would take in the event the Court were otherwise to deny the Petition.  (Pet. Reply at 16.)  This belated request is too little too late.  First, Petitioner has had plenty of opportunity already to offer proposed undertakings.  He could have done so in connection with his pre-trial brief but did not.  He did not do so at trial.  And he did not do so in his opening post-trial brief.  Petitioner has presented no valid justification why the record should be opened anew to consider appropriate undertakings. *See Baran v. Beaty*, 526 F.3d 1340, 1351-52 (11th Cir. 2008) (affirming denial of petition where petitioner did not present any evidence of potential undertakings at the hearing and failed to present any basis for not having done so).

Second, the Court finds that there are no undertakings that Petitioner can offer to sufficiently address the problem.  Undertakings are of limited efficacy in that the court imposing the conditions "retain[s] no power to enforce those orders across national borders." *Baran*, 526 F.3d at 1350.  "Because the court granting or denying a petition for return lacks jurisdiction to enforce any undertakings it may order, even the most carefully crafted conditions of return may prove ineffective in protecting a child from [grave] risk of harm." *Id*.  Accordingly, "in cases in which a district court has determined that repatriating a child will expose him or her to a grave risk of harm, unenforceable undertakings are generally disfavored, particularly where there is reason to question whether the petitioning

94

parent will comply with the undertakings and there are no other sufficient guarantees of performance." *Saada*, 930 F.3d at 540 (internal quotation marks and footnote omitted); *see also Davies*, 2017 WL 361556 at *20 (concluding that petitioner could not be trusted to honor agreements or commitments he might make).

Here, the Court does not believe that Petitioner can be relied on to make the requisite effort to abide whatever undertakings he may propose. Petitioner has not paid any child support in the last two years. He did not agree to pay for a monitor to supervise his visits with E.J. until this Court required him to do so (subject to potential recovery depending on the outcome of the case). He did not inquire about psychological support services in Morocco for treatment of E.J.'s PTSD until the day before his testimony even though he and his counsel had known about Dr. Goslin's evaluation of E.J. well before then. And during some of the supervised in-person visits following trial, the supervisor had to repeatedly remind Petitioner to abide by the rules, including with respect to COVID-19. (P-136 at 3; P-138 at 4, 5; P-139 at 2.) Notwithstanding Guillaume's being "receptive to redirection" (P-138 at 4), all of this demonstrates disregard for E.J.'s psychological well-being as well as reason to doubt the petitioner's ability or willingness to fully comply with undertakings he may promise to abide by in Morocco.[90]

---

[90] An instructive point of comparison can be found in *Rial v. Rijo*, No. 10-CV-1578, 2010 WL 1643995 (S.D.N.Y. Apr. 23, 2010). In *Rial*, the court granted a petition to return the child to Spain, subject to petitioner's undertakings that he would rent an apartment for respondent and the child to stay together, would pay child support, and would not press charges against respondent for the abduction. Here, in contrast, Guillaume has sought and obtained a judgment giving him physical and residential custody of E.J., separating E.J. from her mother except for limited weekend hours, and raising the prospect of criminal proceedings against Geraldine.

Third, there are no potential undertakings that would sufficiently ameliorate the grave risk of psychological harm to E.J. for the same reason that there are no potential Moroccan legal remedies or services that would do so: returning to Morocco will trigger E.J.'s PTSD.  Accordingly, the Court finds that there are no undertakings or other ameliorative measures that can sufficiently protect against the grave risk of harm E.J. would face upon return to Morocco.

## Conclusion

For the foregoing reasons, the Petition is DENIED.

SO ORDERED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  May 11, 2021
          New York, New York

Copies transmitted to all counsel of record.